ACLU OF HAWAII FOUNDATION

Mateo Caballero            #10081
P.O. Box 3410
Honolulu, Hawaii 96801
Telephone:  (808) 522-5908
Facsimile:  (808) 522-5909
E-mail:     mcaballero@acluhawaii.org

LEGAL AID AT WORK

Elizabeth Kristen, *pro hac vice* forthcoming
J. Cacilia Kim, *pro hac vice* forthcoming
Kim Turner, *pro hac vice* forthcoming
180 Montgomery Street, Suite 600
San Francisco, CA 94104
Telephone:  (415) 864-8848
Facsimile:  (415) 593-0096
E-mail:     ekristen@legalaidatwork.org
            ckim@legalaidatwork.org
            kturner@legalaidatwork.org

SIMPSON THACHER & BARTLETT LLP

Jayma M. Meyer, *pro hac vice* forthcoming
425 Lexington Avenue
New York, NY 10017
Telephone:  (212) 455-3935
Facsimile:  (212) 455-2502
E-mail:     jmeyer@stblaw.com

Harrison J. Frahn IV, *pro hac vice* forthcoming
2475 Hanover Street
Palo Alto, California 94304
Telephone:  (650) 251-5000
Facsimile:  (650) 251-5002
E-mail:     hfrahn@stblaw.com

*Attorneys for Plaintiffs*

CIVIL NO. __18-CV-477____

[CIVIL RIGHTS ACTION]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| A.B.[1], by her parents and next friends, C.B. and D.B., and T.T., by her parents and next friends, K.T. and S.T.<br><br>               Plaintiffs,<br><br>    vs.<br><br>HAWAII STATE DEPARTMENT OF EDUCATION and OAHU INTERSCHOLASTIC ASSOCIATION<br><br>             Defendants. | CIVIL NO. _18-CV-477_<br><br>[CIVIL RIGHTS ACTION]<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>[CLASS ACTION] |

---

[1] In accordance with Local Rule 100.10.1(b) of the Local Rules of Practice for the United States District Court for the District of Hawaii, the minor Plaintiffs and their respective next friends are identified by their initials only. In accordance with Local Rule 100.10.2(b), Plaintiffs are filing simultaneously herewith a reference list under seal that identifies the parties' full identities and will serve the same upon Defendants.

A.B., by her parents and next friends, C.B. and D.B., and T.T., by her parents and next friends, K.T. and S.T. (collectively, "Plaintiffs"), by and through their attorneys, for this complaint, allege and aver as follows:

## INTRODUCTION

1.      This case is about ensuring that female athletes in Hawaii's public schools are on a level playing field with their male athlete counterparts. Plaintiffs are female athletes at James Campbell High School ("Campbell"), which is run by the Hawaii State Department of Education ("DOE"). They are passionate and dedicated athletes. Yet simply because of their gender, Plaintiffs experience grossly unequal treatment, benefits, and opportunities in relation to male athletes.

2.      As just one example of this disparity, for decades, male athletes at Campbell have had *exclusive* access to a stand-alone athletic locker room facility in which they can store gear, change, shower, use the bathrooms, hold team meetings, and build team spirit. Female athletes have nothing comparable. As a result, female athletes must lug their athletic gear around all day. Female athletes must resort to changing in teachers' closets, in the bathroom of the nearest Burger King, and even on the practice field, risking potential exposure to bystanders. To go to the bathroom, female athletes must run back to the campus gym (which is located roughly two football fields in length away), use decrepit porta-potties (which are sometimes locked), or face having to crouch down in the bushes.

1

Perhaps most important, female athletes must carry the burden of knowing their educational institution does not value them as much—that they are, in essence, second-class—just because they are female.

3.     The DOE has perpetuated these inequities for decades across its schools. Since at least as early as 1978, the DOE was on notice that it had various unmet deficiencies relating to its Title IX compliance. The DOE said it was working to close those gaps. But what followed was four decades of delay in providing female athletes with treatment, benefits, and opportunities equal to those received by male athletes as required by Title IX.

4.     Sadly, the DOE continues to illegally discriminate against female athletes today. When making athletics decisions, boys' sports come first, and girls' sports second. As just one example of this skewed "boys first" mindset, the DOE's 2016 "Master Plan for Athletic Facilities" recommended that one of its high schools, Kailua High School, proceed with "upgrad[ing] the baseball field to a playoff condition field" *before* building a "girls athletic locker room"—a facility that was, and to this day remains, on the DOE's official "Wish List" of items to accomplish.[2] As set forth below, the DOE's decision-making at Campbell continuously discriminates against girls.

---

[2] Sato & Associates, Inc., *Statewide Athletic Plan, Master Planning and School Assessment, Job No. Q61002-12, Master Plan for Athletic Facilities*, DEP'T OF EDUC., STATE OF HAWAII (Feb. 2016) at PDF 4-5, *available at*

5.      The Oahu Interscholastic Association ("OIA")—which administers policies and regulations governing interscholastic athletics for all Oahu-based DOE high schools, and which acts under the control of and in close coordination with the DOE—also discriminates against girls in its decisions concerning interscholastic athletics, including in scheduling of games, seasons, and tournaments, as well as in publicity and promotion, at Campbell and other Oahu-based DOE high schools.

6.      Plaintiffs seek to change this unjust and unlawful state of affairs. On behalf of the present and future female student athletes at Campbell, Plaintiffs bring this class action against the DOE and the OIA (collectively, "Defendants"), which have unlawfully discriminated on the basis of sex in violation of Plaintiffs' rights under Title IX of the Education Amendments of 1972. Plaintiffs also seek redress against the DOE for unlawfully retaliating against Plaintiffs when they have brought such discrimination to the DOE's attention.

7.      On behalf of themselves and all others similarly situated, Plaintiffs seek declaratory relief and permanent injunctive relief enjoining Defendants from continuing to engage in unlawful sex-based discrimination. Defendants' longstanding practice of putting female athletes of Hawaii second must end.

---

https://www.documentcloud.org/documents/4367267-HIDOE-Athletics-Master-Plan-and-Assessment.html.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs bring this action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* and its implementing regulations.

9.      This Court may order declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

10.      Venue is properly in the United States District Court for the District of Hawaii pursuant to 28 U.S.C. § 1391(b) because Defendants are located in this district, and the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

**Plaintiffs**

11.      Plaintiff A.B., age 17, is a twelfth-grade student at Campbell who competes on the girls' varsity water polo and the girls' varsity swimming teams. Defendants have discriminated against A.B. on the basis of her sex by denying her equal athletic opportunities, treatment, and benefits.  Because A.B. is a minor, she brings this action by her next friends, her parents C.B. and D.B. A.B., C.B., and D.B. are residents of Hawaii.

12.      Plaintiff T.T., age 17, is a twelfth-grade student at Campbell who competes on the girls' varsity water polo and the girls' varsity swimming teams. Defendants have discriminated against T.T. on the basis of her sex by denying her

4

equal athletic opportunities, treatment, and benefits. Because T.T. is a minor, she brings this action by her next friends, her parents K.T. and S.T. T.T., K.T., and S.T. are residents of Hawaii.

**Defendants**

13.     Defendant DOE is the state administrative agency that manages the statewide system of public schools consisting of 15 complex areas and 292 schools. Among the schools that the DOE manages is Campbell, which is a four-year public high school located in Ewa Beach, Oahu. Campbell, which is part of the DOE's Leeward Oahu District, is the largest public high school in Hawaii in terms of number of students. The DOE receives federal financial assistance and is subject to the anti-discrimination provisions of Title IX.

14.     Defendant OIA is an unincorporated athletic association composed of all of the DOE's secondary schools on the island of Oahu, Hawaii. The OIA is an instrumentality of, and is controlled by, the DOE.

15.     The DOE is pervasively entwined in the management and control of the OIA. The OIA's Executive Director is a DOE employee, and all five regular members of the OIA's Executive Council are principals of DOE high schools and therefore also DOE employees.

16.     The OIA also has controlling authority over many aspects of the DOE's interscholastic athletic programs, including competitive facilities;

scheduling of seasons, games, and tournaments; travel; publicity and promotion; and budget. The OIA indirectly receives federal financial assistance. The OIA is subject to the anti-discrimination provisions of Title IX.

## FACTUAL ALLEGATIONS

### I. DOE's Long History of Non-Compliance with Title IX

17.     Nearly half a century ago, Congress passed Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex in any federally funded education program or activity. Pub. L. No. 92-318, 86 Stat. 235, 373 (June 23, 1972) (codified at 20 U.S.C. § 1681 *et seq.*). The promise behind Title IX was to root out sex discrimination in all aspects of education programs, and to protect individuals against such discriminatory practices.

18.     In 2002, Title IX was renamed the "Patsy T. Mink Equal Opportunity in Education Act" in honor of Hawaii's own Congresswoman Patsy Mink, the first woman of color elected to Congress, and—notably for the purposes of this lawsuit—a co-author and champion of Title IX.

19.     In many respects, Title IX has been successful in increasing female participation in athletics. As evidence of this success, in 1971, before Title IX was enacted, only about 294,000 of the nation's high school athletes—or roughly 7.4%

of all high school athletes—were girls. Today, that number has risen over ten times to over 3.4 million, meaning that about 42.8% of all high school athletes are girls.[3]

20.     But at least within the State of Hawaii, Title IX's promise remains unfulfilled. Nearly half a century after Title IX took effect, the DOE today fails to provide Campbell female student athletes (and female students at other Hawaii public schools) with athletic opportunities, treatment, and benefits equal to those provided to its male student athletes. And as the history of the DOE's actions—and particularly its *inaction*—shows, the DOE's present failures are in fact the continuation of four decades of noncompliance with Title IX.

**A. Initial Failures to Comply with Title IX: 1978 to 2000**

21.     Since as early as 1978—which is the year by which secondary schools needed to be in compliance with Title IX—the DOE has been discriminating against female athletes in violation of Title IX.

22.     That year, a compliance officer from the federal Equal Employment Opportunity Commission ("EEOC") visited Hawaii to investigate the DOE's compliance with Title IX and other federal civil rights laws. The EEOC found widespread Title IX problems. Among other things, the DOE had not: trained its civil rights coordinators in monitoring educational programs for compliance with

---

[3] National Federation of State High School Associations, *2017-18 High School Athletics Participation Survey*, at 54, *available at* http://www.nfhs.org/ParticipationStatistics/PDF/2017-18%20High%20School%20Athletics%20Participation%20Survey.pdf.

federal sex discrimination laws; promulgated and implemented student and employee Title IX grievance procedures; disseminated information regarding Title IX to DOE students and staff; or monitored school athletic expenditures by sport and sex. Many of these deficiencies remain to this day.

23.    At the time, the DOE represented that it would remedy these Title IX issues. But subsequent events demonstrate that the DOE never did so.

24.    Indeed, over fifteen years later, in 1994, State Representative Jackie Young sent a letter to the DOE expressing dismay about the many gender inequities evident throughout DOE schools and specifically across its facilities for practices and games, equipment and uniforms, travel opportunities, scheduling, competitive opportunities, and budgeting.

25.    After another five years of girls continuing to be denied access to equality in sports, and fed up with the lack of progress, both the Hawaii state legislature and the Governor acted to address the DOE's failures in monitoring and enforcing gender equality in athletics.

26.    The Hawaii state legislature was first to act, passing a bill in 1999 that would have "[p]rohibit[ed] discrimination in athletics on the basis of sex in any public school" and "require[d] the [DOE] superintendent . . . to develop a strategic

plan to ensure equity in sports participation."[4] This legislative action was stopped by the Governor, who vetoed the bill because the DOE had expressly assured the Governor that the agency was "in total compliance" with Title IX.

27.    The DOE's representations were false. In fact, in school year 1999-2000, there were still vast Title IX non-compliance issues. For example, thirty-nine schools had boys' athletic locker rooms while only twenty-three had girls' athletic locker rooms—that is, at least sixteen DOE schools provided locker room facilities in an inequitable manner, and in violation of Title IX.

28.    Upon discovering that the DOE was not in compliance with Title IX, then-governor Cayetano responded with executive action. He demanded that the DOE commit to a timeline for coming into compliance, articulate precisely what its short- and long-term compliance plans were, and start mandatory compliance reviews at every public high school coupled with quarterly and annual reporting.

29.    Shortly thereafter, in 2000, the legislature affirmed that a state law was necessary to ensure that girls realize their right to equal athletic treatment and opportunities in Hawaii's public high schools and passed a law requiring gender equity in athletics (the "Gender Equity in Athletics Law").[5]

---

[4] Gender Equity in Sports, House Bill 532 (1999), https://www.capitol.hawaii.gov/session1999/status/HB532_his_.htm.

[5] Gender Equity in Sports, Senate Bill 2475 (2000), https://www.capitol.hawaii.gov/session2000/acts/Act229_SB2475_CD1_.htm (codified at Haw. Rev. Stat. § 302A-461).

**B. Continued Failure to Comply After Hawaii's Executive and Legislative Branches Mandated Gender Equity in Athletics: 2000 to 2003**

30.     The Gender Equity in Athletics Law's mandate was clear: "No person, on the basis of sex, shall be excluded from participating in, be denied the benefits of, or be subjected to discrimination in athletics offered by a public high school, pursuant to Public Law 92-318, Title IX of the federal Education Amendments of 1972."

31.     The Gender Equity in Athletics Law also created an advisory commission on gender equity in sports ("Advisory Commission") to support the DOE in complying with Title IX's requirements. The Advisory Commission's responsibilities included determining whether the DOE's schools were coming into compliance with Title IX, and making recommendations to the DOE and the state legislature.

32.     For three years, from 2000 to 2003, the Advisory Commission played a key role in exposing routine delays in the DOE's completion of baseline compliance assessments and its piecemeal or misguided approaches to resolving gender equity issues.

33.     During this period, evaluations focused on athletic facilities, scheduling, and coaching at five DOE high schools.[6] The evaluations constituted hundreds of pages, and produced damning results. Among the many findings of

---

[6] Hilo, Kahuku, Kaiser, King Kekaulike, and Roosevelt.

noncompliance: (1) four of the five schools provided better locker rooms for boys than for girls; (2) the highest quality athletic facilities were typically assigned to boys' teams and not girls' teams; (3) at one school, boys' teams had three different dressing rooms available to them, whereas girls' teams had access to a single dressing room; and (4) across the board, boys' teams had far more opportunities to engage in pre-season competition than girls' teams.

34.     In 2003, the Advisory Commission issued its final report.  The report noted that minimal progress had been made regarding gender equity in DOE schools, and highlighted several stark disparities that remained, including the need to build and upgrade girls' athletic locker rooms at many high schools statewide.

35.     The Advisory Commission's report also found that the DOE was not in compliance with the U.S. Department of Education's athletic participation opportunities test. Specifically, the athletic participation rate of girls in DOE schools was substantially disproportionate relative to student enrollment. While girls constituted nearly 48% of students enrolled in DOE schools, they only made up 40% of athletic participants—representing a nearly 8% participation gap. This meant that hundreds or thousands of girls were not getting the chance to play compared to their male counterparts.

### C. Progress on Gender Equity Reverses Course: 2004 to Present

36.     After the Advisory Commission's work concluded, progress regarding gender equity in athletics has halted and, in several respects, even regressed.

37.     For example, according to DOE self-assessments conducted in or around 2005, at least twelve high schools—including Campbell—identified themselves as needing plans to reassign locker rooms from male athletes to female athletes because of ongoing inequalities in the allocation of athletic locker room facilities.[7]

38.     Yet, according to the DOE's 2016 "Master Plan for Athletic Facilities," of the twelve high schools identified as having inequitable locker room facilities, at least four (Baldwin, Campbell, Kahuku, and Waialua) still failed to provide stand-alone athletic locker rooms to girls in 2016.[8] That is, *one third* of the schools that the DOE had conclusively identified as needing remediation in 2005 still had not yet reassigned locker rooms from boys to girls or had not yet closed the gender disparity in other respects *eleven years later*.

39.     According to the same "Master Plan for Athletic Facilities," as of 2016, ten additional schools had athletic locker rooms for boys but not for girls.

---

[7] The following high schools were identified as having an inequitable distribution of athletic locker room facilities: Aeia, Baldwin, Campbell, Farrington, Hilo, Kahuku, Kaimuki, Kau, Keeau, Leilehua, McKinley, Waialua, and Waianae.

[8] Upon information and belief, the same inequities persist at Baldwin, Campbell, Kahuku, and Waialua high schools as of this filing.

40.     Thus, thirteen years after the Advisory Commission's final report—and nearly fifty years after Title IX was passed—the disparity in athletic locker rooms between female athletes and male athletes remains essentially unchanged; at least fourteen high schools provide athletic locker rooms for their male athletes, but not for their female athletes.

41.     In addition to inequitable facilities, Title IX compliance monitoring and enforcement by the DOE has effectively halted. For the past few years, there is no public record that DOE schools have conducted compliance reviews or submitted reports about Title IX compliance. This is so in spite of the fact that the DOE has expressed a commitment to conduct these reviews and submit these reports, and otherwise comply with Title IX.

42.     The DOE's regression with respect to Title IX compliance is troubling in light of history: Title IX non-compliance in DOE schools has been the focus of prior litigation before this Court. In 2010, the ACLU of Hawaii filed a lawsuit in the U.S. District Court for the District of Hawaii on behalf of three female athletes at the DOE's Baldwin High School in Wailuku, Maui, to rectify the DOE's discriminatory treatment of the Baldwin High School girls' softball team.[9]

43.     In granting the plaintiffs' motion for a preliminary injunction, Judge David Alan Ezra concluded that "the evidence is very clear that the girls' facilities

---

[9] *Nobriga v. Dep't of Educ., State of Hawaii*, 1:10-cv-159-DAE-LK, Doc. 1 (D. Haw. Mar. 18, 2010).

are decidedly inferior to those of the boys', and they have been for years."[10] Judge Ezra emphasized that he believed "without reservation that the Department of Education and the people who acted in concert . . . have not met Title IX or constitutional standards, period. This isn't even a close question."[11] Given the extreme disparities he had observed, Judge Ezra expressed surprise at the DOE's non-compliance: "Why somebody didn't file a Title IX suit on this years ago is beyond me . . . ."[12]

44.    Shortly after Judge Ezra's ruling, the DOE entered into a settlement agreement with the plaintiffs that required the DOE to, among other things, improve and expand existing girls' softball facilities, and build a new girls' softball practice field on par with the field already existing for boys.[13]

45.    Despite the 2010 Baldwin High School lawsuit, the DOE has not ensured gender equity in athletics statewide. Across the board, the DOE's gender equity policies and practices remain deficient. In failing to address the vast disparities that remain, the DOE has shown that it acts only when individuals threaten—or, in this case, file—legal action.

---

[10] *Nobriga*, 1:10-cv-159-DAE-LK, Doc. 37, at 37 (D. Haw. Apr. 7, 2010).

[11] *Id.* at 42-43.

[12] *Id.* at 37.

[13] Curtis Lum, *Baldwin Softball Will Get New Field*, THE HONOLULU ADVERTISER (Apr. 8, 2010), http://the.honoluluadvertiser.com/article/2010/Apr/08/ln/hawaii4080344.html.

14

46.     Female athletes at Campbell and across Hawaii have been waiting for nearly fifty years to receive the same treatment, benefits, and opportunities as male athletes as mandated by law. Instead of moving forward to close the gender gap, the DOE appears to be going backwards.

47.     It is precisely because of the DOE's longstanding failure to comply with Title IX that Plaintiffs file the present lawsuit.[14]

## II. **The Unequal Female Athletic Experience at Campbell High School**

48.     Campbell is a four-year public high school located in Ewa Beach, Oahu, and run by the DOE.

49.     Of the DOE's approximately 55 high schools statewide, Campbell serves the most students, matriculating 3,123 students in the 2017-2018 school year. Of those students, 1,506 were female and 1,617 were male.

---

[14] The DOE's indifference to complying with Title IX is not limited to athletics. On December 20, 2017, the DOE and the United States Department of Education entered into a resolution agreement to address deficiencies in the DOE's policies, procedures, and processes used for responding to complaints of harassment of students on the basis of race, color, national origin, sex, or disability. *See* Resolution Agreement, OCR Docket No. 10-11-5003 (Dec. 20, 2017), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/10115003-b.pdf. The United States Department of Education did not investigate—and consequently the resolution agreement did not address—the DOE's failure to provide equal treatment, benefits, and opportunities in athletics under Title IX. *See* Letter from Linda Mangel, Regional Director, U.S. Department of Education, Office for Civil Rights, to Dr. Christina Kishimoto, Superintendent, DOE (Jan. 19, 2018), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/10115003-a.pdf.

50.     The female athletic experience at Campbell today is a byproduct of the DOE's historically inequitable treatment of female athletes in Hawaii's public schools: female athletes receive worse treatment, fewer benefits, and fewer opportunities than male athletes.

51.     Many aspects of the female athletic experience at Campbell are controlled or greatly influenced by the OIA, which through its policies and practices also treats female athletes inequitably by providing them worse treatment, fewer benefits, and fewer opportunities than male athletes.

52.     Upon information and belief, the female athletic experience at other DOE high schools is substantially similar to that at Campbell.

## A. The DOE and the OIA's Sex-Based Discrimination in Athletic Treatment and Benefits

53.     The DOE has failed to provide an effective system for Title IX implementation, monitoring, and compliance across its schools statewide.

54.     Partly due to this lack of oversight, the DOE fails to provide equitable athletic treatment and benefits to Campbell female students in comparison to male students.

55.     As described below, the DOE's sex-based discrimination is evident in its: (i) athletic locker rooms, practice facilities, and competitive facilities; (ii) equipment and supplies; (iii) scheduling of games and practice times; (iv)

16

availability and quality of coaching; (v) travel opportunities; (vi) medical and training services and facilities; and (vii) publicity and promotion.[15]

56.     As described below, the OIA's sex-based discrimination is evident in its: (i) competitive facilities; (ii) scheduling of games; (iv) travel opportunities; and (iv) publicity and promotion.

### i. Locker rooms, practice facilities, and competitive facilities

#### 1. Absence of athletic locker room for female athletes

57.     Campbell is one of the many DOE high schools that fails to provide athletic locker room facilities to female athletes while simultaneously providing such facilities to male athletes.[16]

---

[15] These are some of the factors that the U.S. Department of Education considers in determining whether a school provides equal athletics benefits and opportunities in compliance with Title IX. *See* 34 C.F.R. § 106.41(c).

[16] DOE high schools usually have three types of locker rooms: P.E. locker rooms, gym locker rooms, and athletic locker rooms. P.E. locker rooms are used exclusively for physical education students during the school day. They are generally closed to student-athletes after school hours. Gym locker rooms are attached to the gym and primarily serve student-athletes participating in indoor sports (*e.g.*, volleyball, basketball). Athletic locker rooms are typically stand-alone facilities (often near the school's athletic fields) that primarily serve student-athletes participating in outdoor sports (*e.g.*, track and field, cross country, softball, baseball, football, soccer). Such athletic locker rooms typically are substantially larger and of higher quality than P.E. and gym locker rooms, and also contain more amenities such as toilet stalls, larger and more numerous lockers, showers, and offices. Some DOE high schools have athletic locker rooms attached as annexes to gym locker rooms, rather than as stand-alone facilities. For the purpose of this complaint, "athletic locker room" refers to a school's stand-alone athletic locker room facility and/or any such annex to the gym locker room.

58.     Specifically, male athletes at Campbell have *exclusive* access to a stand-alone athletic locker room facility that is located near the athletic fields. This standalone athletic locker room is a very large facility that is at least two times the size of the gym-based locker room. The stand-alone athletic locker room has about 120 full-size lockers, showers, and at least four bathroom stalls. The stand-alone athletic locker room also has air conditioning and an office.

59.     By contrast, female athletes at Campbell have *no* standalone athletic locker room facility, whether located near the athletic fields or elsewhere on campus. That is, female athletes have no full-size lockers, no showers, no bathrooms, no air conditioning, and no office near the athletic fields.

60.     Instead, female athletes, including Plaintiffs, must carry their athletic gear around with them all day and have resorted to changing in teachers' closets, in the bathroom of the nearest Burger King, and even on the practice field, potentially in full view of bystanders. To use the bathroom, female athletes must run back to the main campus, use decrepit porta-potties (which are sometimes locked), or face crouching down in the bushes. Plaintiffs, who are part of the girls' water polo program, sometimes have no practical choice but to change on the bus.

61.     The absence of an athletic locker room facility has many negative effects on female athletes at Campbell.

62.     Female athletes at Campbell, including Plaintiffs, experience constant stress and inconvenience from the lack of athletic locker room facilities. For example, female athletes experience stress and inconvenience when they are forced to lug their equipment and gear throughout the school day. This interferes with their ability to concentrate on schoolwork during the academic day.

63.     Female athletes at Campbell also experience stress and inconvenience when they struggle—after school ends and before sports practice begins—to find a place in which to change into athletic attire.

64.     Additionally, because they do not have access to athletic locker room facilities, unlike their male counterparts, some female athletes at Campbell hurriedly shuttle home after school to gather equipment and change into practice attire.

65.     Some female athletes at Campbell are penalized by their coaches when they show up late to practice because they cannot find places in which to change, or because the places that they do find are overcrowded, costing them more time to make the transition after school ends.

66.     Campbell female athletes' privacy is routinely compromised as a result of the lack of access to locker room facilities. About half of the girls' softball program and about half of the girls' cross country program change in the bleachers by the field, with students holding up jackets to cover one another in an attempt to

preserve their teammates' privacy. Female athletes in the wrestling program also change and conduct weigh-ins in the Campbell hallways. Female athletes in the judo program change and conduct weigh-ins in the corner of the gym or in the hallway, and male athletes sometimes walk in on the female athletes, including as recently as two weeks ago.

## 2. *Absence of practice facilities for female athletes*

67.     Campbell is one of the many DOE high schools at which girls' sports programs do not have adequate access to practice facilities.

68.     The Campbell girls' water polo program has been consistently treated unequally when it comes to securing practice facilities. For example, during the 2017-18 school year, the DOE failed to secure a pool for the girls' water polo program until *after* the season had already started.

69.     As a result of the DOE's inattention to girls' sports, the Campbell girls' water polo program was left with no choice but to hold dry-land training sessions and open-ocean swim practices at Puuloa Beach Park.

70.     Also, as a result of the DOE's inattention to girls' sports, the Campbell girls' water polo program played at least two regular season games without having had a single minute of practice time in a pool.

71.     In fact, the DOE's failures with respect to the Campbell girls' water polo program are memorialized in the 2018 Campbell yearbook:



# 2.0 Pool

By ████████████

With any sport, a place to train is provided to the athletes. A few weeks into the girls water polo season, James High School Girls Water Polo Team have yet to be placed in the proper training environment. Due to the lack of pool for the girls to train in, they head out to the beach. Training at Pu'uloa Beach Park from 3:00 to 5:30 everyday after school has been a struggle for the girls. ████████████ (11) said, "We don't get to properly train in the environment we play in so that sets us back." Although they are not given the proper environment, they waste no time when it comes to training and make most of what is given to them. ████████████ (11) said, "I think that it's good training, especially with the currents, but it isn't the environment we're always in so it's not necessarily the right training for the specific techniques we need in a pool. For example, the salt water is easier to float in, so our egg beating may not be worked on as hard as it could be when we're in the pool."

72.   This failure occurred even though the students, coaches, and parents associated with the girls' water polo program made various efforts in an attempt to get the DOE and the Campbell administration to secure a pool.

73.   Worse, when members of the Campbell girls' water polo program continued to raise their concerns with the Campbell Principal Jon Henry Lee and

Athletic Director Samuel Delos Reyes, the Campbell administrators retaliated on at least three separate occasions by threatening to "cancel" the water polo team, the water polo season, or both.

74.    By contrast, at the same time that the girls' water polo program was lobbying the DOE and the Campbell administration to secure a practice facility, the Athletic Director was attempting to secure off-season athletic opportunities for the boys' baseball and boys' football programs.

75.    The girls' water polo program was approximately two weeks into the competitive season when the DOE finally secured a pool in which the girls' water polo program could practice.

76.    Additionally, although the DOE legally secured the pool by signing the necessary paperwork, the Campbell girls' water polo coach still had to use his own personal funds to pay to use a regulation-sized pool. The girls' water polo coach spent approximately $60 per day, two days a week, because the DOE would not provide funding.

77.    The Campbell girls' water polo program's experience during the 2017-18 school year is not unique. For at least the five prior years, the girls' water polo program had encountered similar problems gaining timely access to a pool in which to practice. For example, the girls' water polo program has recently had to

practice in a non-regulation pool divided and shared with neighboring rival, Kapolei High School.

78.     The Campbell cheerleading program[17]—which is all-female—also has been consistently treated unequally when it comes to securing practice facilities. The Campbell cheerleading program has no dedicated practice facility and regularly has trouble finding places in which to practice.

79.     Even when it finds a temporary space in which to practice, the Campbell cheerleading program is frequently displaced by other athletic programs. Because of this displacement, the Campbell cheerleading program sometimes has to practice in the Campbell cafeteria, where students resort to changing behind tables. During at least some portion of the 2017-18 school year, the cheerleading program had nowhere to store its mats.

### 3. Unequal facilities

80.     In addition to the *complete absence* of facilities for certain girls' sports programs, the DOE provides unequal facilities to girls' sports programs in relation to boys' sports programs.

---

[17] Plaintiffs do not have sufficient information to take a legal position on whether cheerleading at Campbell counts as an interscholastic athletic activity for the purpose of determining Title IX compliance. *See* U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Athletic Activities Counted for Title IX Compliance* (Sept. 17, 2008), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20080917.html.

81.     For example, Campbell is one of the many DOE high schools at which the girls' softball program's facilities are unequal in relation to the boys' baseball program's facilities.[18]

82.     The DOE provides the Campbell boys' baseball program more facilities and facilities of a higher quality than those provided to the girls' softball program. The boys' baseball program has a dedicated "baseball house," with a couch and mini-fridge, that is used to store equipment, hold meetings, and gather before practice. Additionally, the boys' baseball program has a large storage container in which to store gear and equipment. The boys' baseball program has a batting cage that is for its exclusive use. The boys' baseball program has access to bathrooms in the stand-alone athletic locker room facility, or unisex porta-potties that are conveniently located next to the baseball field.

83.     By contrast, the DOE provides the girls' softball program —which has been Softball Division I state champions four times during the last eight years[19]—few facilities and facilities of lower quality in comparison to their male counterparts. The girls' softball program has no dedicated "softball house"—or any

---

[18] According to the DOE, a renovation of the softball field is "currently in progress," but it is unclear when such renovation will be completed. In fact, as of April 2018, the DOE reported that, rather than being in progress, the "[s]oftball field renovations are in the planning stage." Ewa Beach Neighborhood Board No. 23 Meeting Minutes (Apr. 12, 2018), *available at* http://www.honolulu.gov/cms-nco-menu/site-nco-sitearticles/31332-ewa-nb-april-minutes.html.

[19] The boys' baseball program has been champions once during that period.

facility even remotely equivalent. The girls' softball program has a storage container, but it is half the size of the boys' container and has so many cracks in the roof that everything is ruined if softball players leave equipment in the container when it rains. The girls' softball program has no batting cage. The girls' softball program has no access to bathroom facilities near the softball field, so they must instead resort to using the porta-potties (which are located next to the *baseball* field and are sometimes locked), running to the gym (which is located roughly two football fields in length away), or crouching down behind the storage container.

84.    The boys' baseball field is also located closer to the school and on the better section of the shared athletic field area. Specifically, the baseball field is at a higher elevation than the softball field.

85.    The girls' softball field, on the other hand, is located further away from the school and on the worst section of the shared athletic field area. Because the softball field is at a lower elevation than the baseball field, when it rains, the softball field frequently floods and requires the use of sponges and other drainage methods to make the field usable by the softball program.

### 4. Unequal facility maintenance

86.    In addition to the stark disparities that exist between the athletic facilities provided to boys relative to girls, the Campbell administration provides better maintenance regarding boys' facilities as compared to girls' facilities.

87.    For example, the boys' football program had its broken lights on the football field fixed immediately, whereas the girls' soccer program could not even convince the Campbell administration to install lights for after-dark practice and competition.

88.    The soccer field is frequently irrigated during scheduled girls' soccer practices, forcing the girls' soccer program to practice inside the gym, which is dangerous because of the increased risk of slippage and knee injuries from the smooth hard surface.

89.    Upon information and belief, the DOE uses funding, accepts contributions, or allows funding to be used (regardless of source) to provide unequal athletic treatment and benefits to male athletes as compared to female athletes with respect to athletic locker rooms, practice facilities, and competitive facilities. Upon information and belief, this unequal provision of benefits has been longstanding and has led to—and will continue to lead to—unequal practice and competitive facilities over time.

26

90.     Thus, the DOE and the Campbell administration have a systematic policy and practice of using limited resources and capacity to provide better athletic facilities and benefits to male athletes as compared to female athletes.

### 5. *Unequal allocation of competitive facilities*

91.     The DOE and the OIA (which acts under the control of, and in close coordination with, the DOE) determine which competitive facilities are used by athletic programs in DOE interscholastic athletic competition.

92.     The DOE and the OIA unlawfully discriminate against female athletes by consistently allocating the prime competitive facilities to boys' sports programs.

93.     For example, upon information and belief, the DOE and the OIA grant the boys' football programs exclusive use of Aloha Stadium, which, as the largest stadium in Hawaii, is the premier competitive facility in the state. The Campbell boys' football program used Aloha Stadium as recently as November 2, 2018, when it competed in an OIA championship playoff game against Farrington High School. The Campbell boys' football program also competed there in an OIA playoff game in October 2017. By contrast, upon information and belief, no girls' sports program has ever had the opportunity to use Aloha Stadium for athletic competition.

### ii. Equipment and supplies

94.     The provision of equipment and supplies is inequitable between female and male athletes at Campbell.

95.     Upon information and belief, the DOE uses funding, accepts contributions, or allows funding to be used (regardless of source) to provide unequal athletic treatment and benefits to male athletes as compared to female athletes with respect to equipment and supplies. Upon information and belief, this unequal provision of benefits has been longstanding and has led to—and will continue to lead to—unequal equipment and supplies over time.

96.     The DOE consistently does not provide proper equipment and gear to the Campbell girls' water polo program. For the most part, the girls' water polo program relies on parents to use personal funds to purchase equipment. For example, a couple years ago, parents bought replacement swimsuits for the water polo athletes because the DOE failed to provide them. The girls' water polo program also used to have old swim caps that did not meet game regulations. These old swim caps further posed a serious safety and choking hazard because they were loose, stretched out, and often fell behind the athletes' heads while hanging around their necks, which created more drag underwater and allowed opponents to pull the athletes underwater.

97.     The girls' soccer program experiences similar problems obtaining proper equipment and gear. For example, during the 2016-17 school year, a parent of a girls' soccer team player used personal funds to purchase new uniforms because the DOE failed to provide them.

98.     Meanwhile, the football program has no trouble obtaining proper equipment and gear, which are refreshed on a regular basis. Upon information and belief, the DOE provides the Campbell boys' football program proper equipment, gear, and supplies.

### iii.  Scheduling of games and practice time

99.     The DOE and the OIA control and operate the scheduling of seasons, games, and tournaments relating to interscholastic athletics in DOE schools.

100.    The scheduling of games and practice times is inequitable between female and male athletes at Campbell.

101.    Friday nights are considered prime time for athletic competition at Campbell because they draw the largest crowds and student and community support. However, based upon the publicly available schedules of Campbell sports programs' games in the 2018-19 school year, *three quarters* of the Friday night slots are designated for boys' sports programs. By contrast, girls' sports programs rarely play on Friday nights.

102.   In fact, girls' sports programs tend to play on less ideal days. For example, during the 2017-18 school year, the girls' softball program played many of its regular season games on Tuesdays and Thursdays, which are less ideal days than Fridays or weekend days, because games in the middle of the week do not draw large crowds and student and community support, and also interfere with student-athletes' ability to attend school, complete homework, and study for tests.

103.   By contrast, during the 2017-18 school year, the boys' baseball program typically played regular season games on Fridays or weekend days.

104.   This inequitable scheme is substantially the same regarding practice time. The DOE illegally discriminates against practice times for girls' sports in favor of those for boys' sports.

105.   For example, the boys' basketball program is allowed to hold double practices at the expense of the girls' volleyball program. Specifically, the boys' basketball program displaces the girls' volleyball program whenever the boys' basketball program decides it wants to have additional practice.

106.   As another example, during the spring, even though the boys' football program is in its off-season, it regularly displaces the track and field program.

107.   The girls' programs also practice during less preferable times in relation to when the boys' programs practice.

108.   For example, even though the track and field program is co-educational, the girls' track and field athletes almost always start their practice first, at around 3 p.m., when the heat and humidity is most oppressive. Meanwhile, the boys' track and field athletes start their practice later, at around 4:30 p.m., when the weather is cooler and the sun is less intense.

109.   The girls' soccer program practices on the field after the football program.  The field is often full of divots created by football practice, making it dangerous for the girls' soccer program to practice and leading to increased injuries.

### iv.  Availability and quality of coaching

110.   The DOE provides female student athletes at Campbell fewer opportunities to receive coaching in comparison to male student athletes.

111.   Upon information and belief, the DOE does not provide female athletes the same or similar number of coaches as it provides male athletes. Specifically, the DOE provides more coaches on a per-athlete basis to boys' sports teams than to girls' sports teams.

112.   The DOE also discriminates against girls by failing timely to fill gaps in coaching positions for girls' sports as compared to coaching positions for boys' sports. Upon information and belief, Campbell presently has no girls' varsity softball coach and no girls' soccer coach. Upon information and belief, the

31

coaching vacancies for boys' sports are filled more quickly than those for girls' sports. Upon information and belief, the DOE and the Campbell administration illegally discriminate by hiring coaches for boys' sports over girls' sports.

113.   Further, upon information and belief, the DOE does not provide female athletes coaches of the same experience and qualifications as those provided to their male counterparts. Upon information and belief, the DOE hires coaches for girls' sports programs who are less experienced and qualified than those hired for boys' sports programs.

114.   The DOE provides unequal compensation between coaches of girls' sports programs and coaches of boys' sports programs.

115.   For example, for two of the past three years, the assistant coaches of the girls' water polo program did not receive any compensation.

116.   Upon information and belief, the reason that the coaches for the girls' water polo program did not receive compensation is that the DOE decided to use the monies allocated for the girls' water polo program both to provide greater compensation to boys' football program coaches, and to provide more assistant coaches to the boys' football program.

117.   Upon information and belief, every head coach and every assistant coach of a boys' sports team receives compensation for coaching services provided to Campbell's male athletes.

118.   Upon information and belief, and as a result of the disparities in coaching described above, the tenure of coaches and assistant coaches for girls' sports programs tends to be substantially shorter than the tenure of coaches and assistant coaches for boys' sports programs. For example, the girls' water polo program has had three different head coaches in the last four years, which has been incredibly disruptive to the water polo athletes. Indeed, both A.B. and T.T. have had a different water polo coach each year they have attended Campbell.

119.   The disparities in the number of coaches, their qualifications, their compensation, and their tenure significantly reduce female athletes' opportunities to grow as athletes, both individually and as a team.

120.   Upon information and belief, the DOE uses funding, accepts contributions, or allows funding to be used (regardless of source) to provide unequal athletic treatment and benefits to male athletes as compared to female athletes with respect to coaching. Upon information and belief, this unequal provision of benefits has been longstanding and has led to—and will continue to lead to—unequal coaching over time.

### v.  Travel opportunities

121.   The DOE and the OIA control and operate the travel opportunities relating to interscholastic athletics in DOE schools.

122.   The DOE and the OIA's provision of travel opportunities is inequitable between female and male athletes at Campbell.

123.   Upon information and belief, the DOE uses funding, accepts contributions, or allows funding to be used (regardless of source) to provide unequal athletic treatment and benefits to male athletes as compared to female athletes with respect to travel opportunities. Upon information and belief, this unequal provision of benefits has been longstanding and has led to—and will continue to lead to—unequal travel opportunities over time.

124.   The boys' varsity football team frequently travels to neighbor islands in the State of Hawaii as well as to locations outside of the state for both in-season and off-season playing opportunities.

125.   During the 2017-18 school year, the boys' varsity football team traveled to Las Vegas during the winter off-season to participate in a regional tournament.

126.   During the 2018-19 school year, the boys' varsity football team traveled to the Big Island to play in a non-conference game against a Big Island-based team.

127.   During the 2018-19 school year, the Campbell Athletic Director contracted for the boys' varsity football team to travel to Phoenix, Arizona, for a week-long "road trip" that included games against a Phoenix-based football team.

34

128.   As another example, during the 2017-18 school year, the boys' varsity baseball team flew to the Big Island and Maui for some of its games and tournaments.

129.   Girls' varsity sports teams do not have—and have not had—similar opportunities to travel off the island of Oahu or out of state for practice, competition, or other forms of athletic enrichment.

### vi.  Medical and training services and facilities

130.   Female student-athletes experience the inequitable provision of medical and training services, and inequitable access to such facilities in comparison to their male counterparts.

131.   Upon information and belief, the DOE uses funding, accepts contributions, or allows funding to be used (regardless of source) to provide unequal athletic treatment and benefits to male athletes as compared to female athletes with respect to medical and training services and facilities. Upon information and belief, this unequal provision of benefits has been longstanding and has led to—and will continue to lead to—unequal medical and training services and facilities over time.

132.   For example, during the 2017-18 school year cross country season, on at least one occasion, female cross country athletes were seeking treatment from the trainers in the gym. When members of the boys' football program entered the

training room, the female cross country athletes were asked to move aside so that the boys' football players could be treated first.

133.   Trainers are less likely to be present at girls' games than boys' games.

134.   For example, for several years before the present school year, the Campbell trainers did not attend a single girls' water polo game.

135.   The 2017-18 school year was the first year in the past four years that the Campbell trainers attended a girls' water polo game. Nonetheless, Campbell trainers attended only about three of the twelve games that the girls' water polo team played during the 2017-18 school year. Notably, the Campbell trainers were relied on by the water polo team to address injuries each time they were present at games, showing that they play a necessary and valuable role in athletics.

136.   Upon information and belief, at least one Campbell trainer attends every boys' football or boys' baseball game.

137.   Because of the DOE's discrimination, Campbell female athletes have been put at increased risk of injury. For example, three seasons ago, a water polo athlete was experiencing hyperventilation, a panic attack, and muscle cramps. No Campbell trainer was present for the game, and the athlete was lucky to be able to rely on a non-Campbell trainer to address her medical needs.

### vii.  Publicity and promotion

138.   The DOE and the OIA control and operate the publicity and promotion relating to interscholastic athletics in DOE schools.

139.   Upon information and belief, girls' sports are less often publicized and promoted by the DOE and the OIA, and when girls' sports are publicized and promoted, female athletes are often recognized merely as an afterthought.

140.   Upon information and belief, the DOE uses funding, accepts contributions, or allows funding to be used (regardless of source) to provide unequal athletic treatment and benefits to male athletes as compared to female athletes with respect to publicity and promotion. Upon information and belief, this unequal provision of benefits has been longstanding and has led to—and will continue to lead to—unequal publicity and promotion over time.

141.   The DOE and the OIA illegally discriminate by consistently giving preferential treatment to the Campbell boys' football program and the boys' baseball program with respect to publicity and promotion, including, as previously alleged, as a result of the inequitable scheduling of games. Specifically, when boys' athletic programs receive better schedules (such as Friday and weekend days), they are more likely to receive media coverage, and people are more likely to be available to watch.

142.  The girls' sports programs do not receive similar publicity and promotion, including as a result of the inequitable scheduling of games.

143.  The "Photo Albums" page of the Campbell website is instructive of this disparity between the promotion of girls' sports and boys' sports. The Campbell website includes albums on various school events, including homecoming, graduation, contests, and athletics.[20] Yet, *all* of the athletics-related photo albums on the Campbell website are of the boys' football program. In fact, of the approximately 600 total photos on the "Photo Albums" page of the Campbell website, over 250 photos—or over 44% of all Campbell photos—depict the boys' football program.

144.  By contrast, *zero* photo albums—and, upon information and belief, *zero* photos—on the "Photo Albums" page of the Campbell website depict a girls' sports program.

145.  Additionally, the DOE decided to schedule cheer and band only for football athletic events. Therefore, the Campbell cheerleaders and band do not attend any girls' athletic events or promote any of the girls' sports programs.

146.  The DOE and the Campbell administration inequitably publicize and promote girls' sports in other ways.

---

[20] *See* https://www.campbellhigh.org/apps/album/#!&s=0

147.   For example, the DOE and the Campbell administration have failed on several occasions to recognize the girls' water polo program. During one athletic award assembly at which every sports program was to be recognized, the Campbell administration completely forgot about the water polo program. Because the Campbell administration forgot about the water polo program, a Campbell staff member scribbled lettering on a poster while the assembly was already occurring as a belated attempt to recognize the water polo program.

148.   During a separate pep rally, the Campbell administration recognized the achievements of various Campbell sports programs, but again failed to recognize those of the girls' water polo program—even though the team had advanced to the state championship for the first time that season.

149.   The Campbell Athletic Director has a history of making disparaging remarks towards the girls' water polo program. For example, at one game during the 2014-15 school year, the Athletic Director joked that, if the water polo program was going to lose, Campbell should not even have a water polo program. Despite the Athletic Director's remark, the Campbell girls' water polo program won that game.

## B. The DOE's Failure to Effectively Accommodate Female Students' Interest and Abilities Regarding Participation Opportunities

150.   During the 2017-18 school year, Campbell had 3,123 students enrolled: 1,506 students were girls and 1,617 were boys. Thus, girls represent

about 48.2% of the student body at Campbell, while boys represent about 51.8% of the student body.

151.    However, based on information and belief and incomplete available data,[21] there are approximately 345 female athletes and 484 male athletes at Campbell. This means that female athletes account for about 41.6% of the athletic opportunities at Campbell, while male athletes account for about 58.4% of the athletic opportunities.

152.    Thus, there exists a 6.6 percentage-point participation gap between female athletic participation and female student body enrollment.[22]

153.    Based on this participation gap, at least 106 additional opportunities for female athletes must be added to meet part one of the Title IX's three-part test (substantial proportionality).

---

[21] The ACLU of Hawaii sent the DOE a public records request under the Uniform Information Practices Act ("UIPA") asking for, among other things, "gender participation rates in athletic programs, teams, and opportunities from the 2009-2010 school year to present."

[22] The "participation gap" is the difference, expressed in percentage points, between the percentage of students who are girls and the percentage of athletic participation opportunities (as measured by the number of roster spots) provided to girls. The participation gap is a key measure used to assess Title IX compliance. The U.S. Department of Education's Office for Civil Rights collects athletic participation data from public schools nationwide as part of the Civil Rights Data Collection. *See* Department of Education, Office for Civil Rights, Civil Rights Data Collection, https://www2.ed.gov/about/offices/list/ocr/data.html.

154.   Upon information and belief, the DOE does not have a history and continuing practice of expanding athletic programs for girls at Campbell, and therefore do not satisfy part two of the three-part test.

155.   The DOE will not establish that they have met Campbell girls' interests and abilities in playing sports in greater numbers, regarding part three of the three-part test.

### III.   The DOE's Responses to Title IX Complaints

### A. Retaliation

156.   Under Title IX, a plaintiff is not obligated to provide notice or to exhaust administrative remedies. Nevertheless, Plaintiffs and other Campbell female athletes, and their parents and coaches, have made numerous written and oral requests seeking equal accommodation and attempting to engage in discussions with the DOE towards that end. Despite these efforts, the DOE's discrimination against and unequal treatment of Plaintiffs has been persistent and ongoing. And instead of addressing Plaintiffs' concerns, the DOE has retaliated against Plaintiffs.

157.   On many occasions, Plaintiffs and their female athlete classmates, parents, and coaches have complained to the DOE and voiced their concerns about the unfair treatment that female athletes have received at Campbell.

158.   The DOE and the Campbell administration have not addressed the complaints or concerns raised by the female athletes of Campbell.

159.   Instead of addressing the female athletes' serious concerns, the DOE and the Campbell administrators retaliated. For example, the DOE and the Campbell administrators, on at least three separate occasions, threatened to "cancel" the water polo team, the water polo season, or both.

160.   The DOE and the Campbell administrators also retaliated by increasing their scrutiny of, showing more hostility towards, and withholding resources, funding, coaching, and other support from the girls' water polo program. For example, the DOE and the Campbell administrators withheld funding by refusing to sign a $1,000 grant that was given to the water polo program, which forced the program to seek assistance from a different non-profit organization. As another example, shortly after one heated meeting among water polo athletes, their parents, and the Campbell Principal and Athletic Director, the Campbell administrators informed the water polo athletes that about half of the program's paperwork (*e.g.*, doctor's physical evaluation forms, parental consent forms) was missing. Even though this paperwork had, in fact, been completed and submitted by the water polo athletes, the Campbell administrators told the water polo athletes that they needed to resubmit all of these forms.

## B. Inaction

161.   On February 9, 2018, the ACLU of Hawaii sent a letter to various DOE officials—including Superintendent Christina Kishimoto, Assistant Superintendent for School Facilities and Support Services Dann Carlson, and Civil Rights Compliance Office Director Anne Marie Puglisi—regarding sex discrimination against female athletes in Hawaii. Among other things, the letter noted that fourteen DOE high schools "do not have athletic locker rooms for female students, while having such facilities for male students."

162.   The letter requested that, by March 12, 2018, the DOE respond with "a plan that concretely addresses the glaring inequality between girls' and boys' athletic facilities in DOE schools." The letter also requested that that plan ensure that DOE schools become "fully compliant with Title IX by the first day of the 2018-19 school year."

163.   On March 2, 2018, the DOE sponsored three 45-minute-long meetings at Campbell in which representatives from each of the Campbell girls' sports programs met with Title IX compliance specialists from the DOE's Civil Rights Compliance Office to raise concerns about gender equity in athletics.[23]

---

[23] The DOE's Civil Rights Compliance Office was recently renamed the "Civil Rights Compliance Branch." *See* http://www.hawaiipublicschools.org/ConnectWithUs/Organization/OfficesAndBranches/Pages/CRCO.aspx.

164.   The ACLU of Hawaii represented some of the students and parents at the March 2, 2018 meetings.

165.   Upon information and belief, the DOE has not made any meaningful changes to the athletics program at Campbell or other DOE schools in response to these March 2, 2018 meetings and/or other similar meetings held at other DOE schools.

166.   The ACLU of Hawaii repeatedly requested that the DOE share its past and present Title IX compliance plans and policies, including its written plan to address the inequities described in the February 9, 2018 demand letter.

167.   Concerned by the DOE's failure to provide meaningful information about its Title IX compliance findings, plans, and processes, the ACLU of Hawaii turned to public records requests under the Uniform Information Practices Act ("UIPA") to obtain information on the DOE's past and present Title IX compliance efforts. In response to these requests, the ACLU of Hawaii received few documents and little clarity about the DOE's Title IX compliance efforts.

168.   More specifically, on July 12, 2018, the ACLU of Hawaii submitted a UIPA request seeking information regarding (1) Campbell's athletic facilities, including their use by sport and gender; (2) Campbell's athletic budgets, including line items broken down by team and gender; (3) DOE policies and plans regarding athletic budgeting and financial decision-making; (4) findings, conclusions, and

recommendations from the gender equity assessments and site visits that the DOE purported to conduct in or around March 2018; (5) enrollment data by gender and gender participation rates in athletic programs; and (6) other plans and policies to remedy already-identified and future gender-based disparities.

169.   In response to this July 12, 2018 request, the DOE provided very few documents, some of which were publicly available, and almost all of which provided insufficient detail. In fact, excluding coaching payroll data, the DOE provided only four documents, totaling *nine* pages. One of these documents was a publicly available campus map. Another was a 1.5-page document purporting to be a "System of Self-Assessment, Reporting, and Monitoring" for Title IX compliance in DOE athletic programs. Notably, the DOE withheld all records relating to the March 2018 assessments and site visits and its plans to remedy already-identified gender-based disparities "due to government frustration." The DOE also redacted all names from the payroll data it provided, even though H.R.S. § 92F-12(a)(14) requires the disclosure of, among other things, the name and compensation of state employees. Despite the paucity of records provided by the DOE, it nevertheless affirmed that "[e]very record found to be responsive [wa]s provided in its entirety."

170.   On August 27, 2018, the ACLU of Hawaii submitted a second UIPA request again seeking more information regarding (1) features and dimensions of

Campbell's athletic facilities; (2) Campbell's athletic rosters; (3) the names, positions, and compensation of all athletic staff at Campbell; and (4) the DOE's policies and procedures regarding athletic coaching.

171.   In response to this August 27, 2018 request, the DOE provided three documents and one spreadsheet: a document with architectural plans for Campbell, a document containing payroll data showing the names of the athletic staff, a spreadsheet outlining DOE's athletic position pay rates, and an "Athletic Handbook" dated June 2009. The DOE also provided partially redacted rosters.

172.   In sum, despite multiple attempts through several different avenues, the DOE continues to place the issues of Title IX compliance and gender equity within a black box that is shielded from public scrutiny.

173.   The discrimination against the female athletes of Campbell persists today in the midst of the fifth month of the 2018-19 school year.

174.   The DOE, through its actions and omissions—and the actions and omissions of its officials, employees, and agents, including the OIA—has engaged and continues to engage in gender-based discrimination against girls who desire to play scholastic competitive-level sports for Campbell.

175.   Plaintiffs bring this lawsuit to end Defendants' ongoing and systematic violations of the basic civil rights of girls who participate, or desire to participate, in the Campbell athletics program.

176.   As discussed above, these violations are symptomatic of pervasive, systemic and longstanding practices and policies of Defendants that deny girls an equal opportunity to participate in athletic programs and enjoy the breadth of educational, health, and professional benefits that flow from such participation.

## IV.   The Effects of the Unequal Treatment and Opportunities for Female Athletes

177.   Plaintiffs are under no obligation to show particular negative effects to prove Title IX violations.

178.   Nonetheless, Plaintiffs take this opportunity to assert the harms they have suffered. Defendants' unequal treatment has many negative consequences on Plaintiffs' academic performance, athletic performance, family obligations, and ability to obtain athletic scholarships for college.

179.   Additionally, because of Defendants' unlawful treatment, Plaintiffs believe they and fellow female athletes are valued less—that they are second-class. Indeed, as one court has found, the practice of providing such unequal treatment "sends the clear message that female athletes are subordinate to their male counterparts, and that girls' sports take a backseat to boys' sports." *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 178 F. Supp. 2d 805, 836 (W.D. Mich. 2001), *aff'd*, 459 F.3d 676 (6th Cir. 2006). Similarly, in the 2010 lawsuit concerning Maui's Baldwin High School, Judge Ezra elaborated on how "the psychological aspects" of gender inequities "are huge for girls":

47

> When these boys run out on that stadium field, they have a sense of
> pride. It fills them with a sense that they have accomplished
> something. When a girl is relegated to running out on a dirt field in
> some park, are they filled with the same kind of pride? I don't think
> so. And I don't think it takes a genius to figure out those differences.[24]

180.   Because of the inequities perpetuated by Defendants, Campbell also

loses out on opportunities to host games, tournaments, and other competitions for

girls' sports, which further negatively impacts female athletes' educational and

athletic experiences.

181.   Additionally, the poor treatment results in Campbell female athletes

failing to achieve their full athletic potential, and thereby losing out on

opportunities to win scholarships for post-secondary education.

182.   For example, because of the consistent manner in which the DOE fails

to provide or delays providing a pool in which to practice, A.B., T.T., and their

teammates are deprived of opportunities to practice in regulation water polo

conditions, and to practice the specific skills required to excel as water polo

athletes. Similarly, because of the consistent manner in which the DOE unlawfully

discriminates in providing sufficient and high-quality coaching—thereby leading

to frequent changes in coaching staff—A.B., T.T., and their teammates constantly

have to form new relationships and adapt to each coach's communication and

---

[24] *Nobriga v. Dep't of Educ., State of Hawaii*, 1:10-cv-159-DAE-LK, Doc.
37, at 34 (D. Haw. Apr. 7, 2010).

coaching style. This further prevents A.B., T.T., and their teammates from reaching their full potential as water polo athletes.

183.    As another example, T.T.'s negative experience with the Campbell athletics program has put her collegiate scholarship opportunities at risk. As a sophomore, T.T. was one of Hawaii's top high school water polo athletes. As a junior, T.T. aspired again to be one of the state's top athletes. College scouts reached out to her expressing interest in her athletic abilities. But T.T.'s aspirations were severely hampered by the DOE's failure to timely provide access to a pool for the Campbell girls' water polo program during the 2017-18 school year. By the time the water polo season had started, the team had not yet set foot in a pool for practice because the DOE had failed to secure a pool for the program. Thrown off by the inability to practice in a pool, the Campbell girls' water polo team lost two of its first four games. As a result of the DOE's inequitable treatment of the girls' water polo team, T.T. could not perform as well as she would have liked. T.T. missed out on improving her water polo play statistics, which are important to college scouts.

## CLASS ACTION ALLEGATIONS

184.    Plaintiffs reallege and incorporate by reference as though fully contained herein, the allegations set forth in the preceding paragraphs.

185.   The named Plaintiffs bring this action on behalf of themselves and on behalf of a class of all those similarly situated pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

**Definition**

186.   Plaintiffs seek to represent a class of all present and future Campbell female students and potential students who participate, seek to participate, and/or are or were deterred from participating in athletics at Campbell (the "Class").

**Numerosity**

187.   The Class is so numerous that joinder of all members is impractical.

188.   Plaintiffs are informed and believe, and based thereon allege, that in the 2017-18 school year, the latest time period during which information is publicly available, there were 1,506 female students in grades 9-12 at Campbell and approximately 345 female students in the athletics program.

189.   It is unknown how many additional current female students or how many additional future female students would seek to participate in interscholastic athletics if additional opportunities were available. Moreover, members of the Class who may suffer future injury are not capable of being precisely identified at this time, as the Class includes future Campbell female athletes. Upon information and belief, accordingly, class members number in the hundreds and possibly thousands.

**Common Questions of Law and Fact**

190.   Common questions of law and fact predominate, and include: (a) whether current and future female student athletes at Campbell are receiving unequal treatment and benefits in comparison to the male student athletes; (b) whether current and future female students at Campbell are being deprived of equal opportunities to participate in interscholastic sports; and (c) whether current and future female students at Campbell are being retaliated against for complaining about sex discrimination.

**Typicality**

191.   The claims of the named Plaintiffs are typical of the claims of the Class. The type of discrimination and retaliation that Plaintiffs have suffered as a result of sex include: receipt of unequal treatment and benefits in Campbell's sports programs in addition to exclusion from opportunities to participate in sports programs at Campbell.  Such discrimination is typical of the sex discrimination that members of the Class have suffered, are suffering, and, unless this Court grants relief, will continue to suffer.

192.   A.B. is a typical member of the proposed class. She is a current female student athlete at Campbell for the 2018-19 school year who is subject to discriminatory unequal participation opportunities due to Defendants' failure to accommodate female students' athletic interests and abilities as well as provide

equal treatment and benefits to female student athletes. Defendants have subjected A.B. to sex-based discrimination.

193.   T.T. is a typical member of the proposed class. She is a current female student athlete at Campbell for the 2018-19 school year who is subject to discriminatory unequal participation opportunities due to Defendants' failure to accommodate female students' athletic interests and abilities as well as provide equal treatment and benefits to female student athletes. Defendants have subjected T.T. to sex-based discrimination.

## Adequacy of Representation

194.   The named Plaintiffs will fairly and adequately represent and protect the interests of the Class because they seek relief on behalf of the Class they represent as a whole and have no interest antagonistic to other members of the Class. Plaintiffs intend to prosecute this action rigorously in order to secure remedies for the entire class.

195.   The named Plaintiffs are represented by counsel from the ACLU of Hawaii; Legal Aid at Work; and Simpson Thacher & Bartlett LLP. Counsel are experienced in state and federal civil rights litigation and class actions, including specifically Title IX class action litigation.

## Rule 23(b)(2)

196.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## DECLARATORY AND INJUNCTIVE RELIEF

197.   An actual and immediate controversy exists between Plaintiffs and Defendants, which parties have genuine and opposing interests and which interests are direct and substantial. Plaintiffs contend that Defendants violated their rights and the rights of the Class under federal anti-discrimination law. Plaintiffs are informed and believe and, based thereon, allege that Defendants deny these allegations. Declaratory relief is therefore necessary and appropriate.

198.   Plaintiffs and the class members have no plain, adequate, or complete remedy at law. Unless enjoined by the Court, Defendants will continue to infringe on Plaintiffs' and class members' statutory rights and will continue to inflict irreparable injury. This threat of injury to Plaintiffs and class members from continuing violations requires permanent injunctive relief.

## FIRST CLAIM FOR RELIEF

**Violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681
*et seq.* and Its Implementing Regulations
(Unequal Treatment and Benefits in Athletic Programs)
(Against All Defendants)**

199.   Plaintiffs reallege and incorporate by reference as though fully contained herein, the allegations set forth in the preceding paragraphs.

200.   Title IX provides: "No person . . . shall, on the basis of sex, . . . be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S. C. § 1681(a).

201.   Since the passage of Title IX, the DOE has received and continues to receive federal financial assistance and the benefits therefrom. Therefore, all of the DOE's programs, including its athletic programs, and all officials, employees and/or agents of the DOE, are bound by the requirements of Title IX and its implementing regulations. 20 U.S.C. § 1687. This includes the OIA, which both is a part of, and controls, the DOE's athletic programs.

202.   Title IX's implementing regulations provide: "No person shall, on the basis of sex, . . . be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and the recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a).

203.   Under Title IX, schools must provide "equal treatment and benefits" to members of both sexes in their athletic programs. 44 Fed. Reg. 71,413 (1979), the Department of Education, Office for Civil Rights' 1979 Policy Interpretation

("1979 Policy Interpretation"). Equal treatment and benefits are assessed based on an overall comparison of the male and female student athletic programs, including an analysis of the following factors, among other considerations: "The provision of equipment and supplies; Scheduling of games and practice time; Opportunity to receive coaching . . .; Assignment and compensation of coaches . . .; Provision of locker rooms, practice and competitive facilities; Provision of medical and training facilities and services; . . . Publicity" and a school's "failure to provide necessary funds for teams for one sex." 34 C.F.R. § 106.41(c)(2)–(10). *See also Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1115 (S.D. Cal. 2012), *enforced*, No. 07CV714-L JMA, 2014 WL 1028431 (S.D. Cal. Mar. 17, 2014), *aff'd*, 768 F.3d 843 (9th Cir. 2014) (finding "[d]efendants have violated Title IX in failing to provide equal treatment and benefits," with respect to plaintiffs' treatment and benefits claim).

204.   The Title IX implementing regulations required that sponsors of interscholastic athletics comply with the regulations within three years of their effective date, or by July 21, 1978, at the latest. The regulations further require that sponsors of interscholastic athletics take such remedial actions as are necessary to overcome the effects of sex discrimination in violation of Title IX. 34 C.F.R. §106.3(a).

205.   Plaintiffs are informed and believe, and based thereon allege, that Defendants have not taken remedial actions and that any remedial actions which Defendants have taken in the past have been insufficient to satisfy Defendants' obligations under Title IX.

206.   Defendants have violated Title IX and its implementing regulations by discriminating against female students, including Plaintiffs, by, among other things, failing to provide female student athletes from Campbell with treatment and benefits that are comparable to the treatment and benefits provided to male student athletes.

207.   Defendants' inequitable treatment of Campbell female athletes demonstrates Defendants' failure to comply with Title IX.

208.   As a proximate result of these unlawful acts, Plaintiffs and the Class have suffered and continue to suffer irreparable injury.

209.   Plaintiffs and the Class are entitled to relief, including declaratory relief and injunctive relief, as well as reasonable attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

**Violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681
*et seq.* and Its Implementing Regulations
(Unequal Participation Opportunities in Athletic Programs)
(Against All Defendants)**

210.   Plaintiffs reallege and incorporate by reference as though fully contained herein, the allegations set forth in the preceding paragraphs.

211.   Title IX provides: "No person . . . shall, on the basis of sex, be excluded from participating in . . . or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S. C. § 1681(a).

212.   Title IX's implementing regulations provide: "No person shall, on the basis of sex, be excluded from participation in, . . . or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and the recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a).

213.   Under Title IX, schools must provide both sexes equivalent athletic participation opportunities. *See* 1979 Policy Interpretation.

214.   "In determining whether equal opportunities are available," it must be considered, "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes" 34 C.F.R. § 106.41(c)(1); *see also Ollier v. Sweetwater Union High Sch. Dist.*, 604 F. Supp. 2d 1264, 1275 (S.D. Cal. 2009), *aff'd*, 768 F.3d 843 (9th Cir. 2014) (finding "defendants are not in compliance with Title IX based on unequal participation

opportunities in athletic program," with respect to plaintiffs' unequal participation opportunities claim).

215.   Compliance in the area of equivalent participation opportunities is determined by a three-part test.

216.   The first part of the test considers: "Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments[.]" *Id.* at 71,418 (Section VII(C)(5)(a)(1)).

217.   The second part of the test considers: "Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex[.]" *Id.* at 71,418 (Section VII(C)(5)(a)(2)).

218.   The third part of the test considers: "Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program." *Id.* at 71,418 (Section VII(C)(5)(a)(3)).

219.   Although the 1979 Policy Interpretation refers to "intercollegiate" sports, it also applies to high schools. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 855 (9th Cir. 2014) ("[T]he three-part test applies to a high school."); *see also McCormick ex rel. McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 300 (2d Cir. 2004) (applying three-part test to high school). Indeed, Title IX is applicable to all recipients of federal education funds, including high schools, and thus the 1979 Policy Interpretation is applicable to interscholastic high school sports as well as intercollegiate sports. 34 C.F.R. § 106.11.

220.   With respect to the first part of the three-part test, Plaintiffs are informed and believe, and based thereon allege, that the ratio of female to male athletes at Campbell is not substantially proportionate to the overall ratio of enrolled female to male students at Campbell.

221.   Further, with respect to the second part of the three-part test, Defendants cannot show "a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities" of Campbell's female students. *Mansourian v. Regents of the Univ. of Calif.*, 602 F.3d 958, 965 (9th Cir. 2010) (citing Office for Civil Rights, Guidance: The Three-Part Test (1996)). Rather, female students have historically been and continue to be underrepresented in the Campbell and DOE athletics programs. Defendants bear the burden on part two, an affirmative defense, and must show a history and

59

continuing practice of adding athletic opportunities for females. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 857-58 (9th Cir. 2014).

222.   Finally, with respect to part three of the three-part test, despite this underrepresentation and despite the interests and abilities of female students at Campbell to participate on additional teams, Defendants have not adequately met the interests and abilities of female student-athletes.

223.   As a proximate result of these unlawful acts, Plaintiffs and the Class have suffered and continue to suffer irreparable injury.

224.   Plaintiffs and the Class are entitled to relief, including declaratory relief and injunctive relief, as well as reasonable attorneys' fees and costs.

225.   Such injunctive relief may include, but is not limited to, the provision of the full range of teams and participation slots in existing sports, with teams for all grade levels, including novice, junior varsity, and varsity-level opportunities for female student athletes.

## **THIRD CLAIM FOR RELIEF**

**Violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* and Its Implementing Regulations**
**(Retaliation)**
**(Against Defendant DOE Only)**

226.   Plaintiffs reallege and incorporate by reference as though fully contained herein, the allegations set forth in the preceding paragraphs.

227.    Title IX and its implementing regulations prohibit retaliation for complaints of sex discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 869 (9th Cir. 2014).

228.    On several occasions, Plaintiffs A.B. and T.T. and other Class members complained to the DOE about its unequal treatment of the Campbell girls' water polo program. These complaints were submitted in both oral and written form.

229.    Plaintiffs A.B. and T.T. and other Class members also engaged in both individual and entire-team meetings with the Campbell Principal and Athletic Director to discuss this unequal treatment. During these meetings, Plaintiffs A.B. and T.T. and other Class members—sometimes with their parents—expressed concern about the inequitable way that the DOE treated the Campbell girls' water polo program, as evidenced most strikingly by the DOE's continual failure to timely secure a practice facility for the team.

230.    After Plaintiffs A.B. and T.T. and other Class members complained about the DOE's sex discrimination, the DOE retaliated by threatening, on at least three separate occasions, to "cancel" the water polo program, the water polo season, or both. As noted above, on at least one occasion, the Campbell Athletic

Director joked that, if the water polo program was going to lose a game, Campbell should not even have a water polo program.

231.   Upon information and belief, after Plaintiffs A.B. and T.T. and other Class members complained about the DOE's sex discrimination, the DOE retaliated by increasing its scrutiny of, and showing more hostility towards, the Campbell girls' water polo program. This includes the DOE's instruction that Campbell water polo athletes resubmit athletic paperwork that the athletes had already submitted, as noted above.

232.   Upon information and belief, after Plaintiffs A.B. and T.T. and other Class members complained about the DOE's sex discrimination, the DOE also retaliated by deliberately withholding resources, funding, coaching, and other support from the girls' water polo program that it otherwise would have provided had Plaintiffs and other Class members not lodged complaints. This includes the withholding of funding by refusing to sign a $1,000 grant, as noted above.

233.   Also, as a result of the DOE's retaliatory acts, Plaintiffs A.B. and T.T. and other Class members are concerned that the DOE will retaliate again if they continue to complain about the DOE's sex discrimination. Plaintiffs A.B. and T.T. and other Class members are dissuaded from raising the issue of sex discrimination with the DOE.

234.   The DOE's retaliatory acts have also created a chilling effect among Campbell's female athletes regarding identifying and complaining about other gender inequities in athletics to the DOE.

235.   The DOE's retaliatory acts were motivated by Plaintiffs A.B. and T.T. and other Class members lodging their complaints of sex discrimination.

236.   As a proximate result of these unlawful acts, Plaintiffs and the Class have suffered and continue to suffer irreparable injury.

237.   Plaintiffs and the Class are entitled to relief, including declaratory relief and injunctive relief, as well as reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the other class members pray that this Court:

A.   Assume jurisdiction over this action;

B.   Certify the Class as proposed above, appoint the named Plaintiffs to serve as representatives of the Class, and appoint undersigned counsel to represent the Class;

C.   Enter an order declaring that Defendants have discriminated on the basis of sex against female students in violation of Title IX;

D.   Enter an order declaring that Defendant DOE has retaliated against female students in violation of Title IX;

63

E.   Issue a permanent injunction against Defendants (and their divisions, officers, servants, employees, attorneys, agents and representatives, successors-in-office and all persons acting or purporting to act in concert or in cooperation with Defendants or pursuant to Defendants' authority):

    i.   enjoining Defendants from retaliating and discriminating on the basis of sex against female students;

    ii.   requiring Defendants to remediate their violations of Title IX by, among other required actions, providing female student athletes with treatment and benefits comparable to those provided to male student athletes and affording female students the equal opportunity to participate in school-sponsored sports;

F.   Retain jurisdiction over Defendants until such time as the Court is satisfied that Defendants' unlawful customs, policies, practices, rules, regulations, acts and omissions complained of herein no longer exist and will not recur;

G.   Award reasonable attorneys' fees, costs and other expenditures incurred as a result of bringing this action, pursuant to 42 U.S.C. § 1988 and other applicable laws; and

H.   Order such other relief as this Court deems just and proper.

64

Dated: Honolulu, Hawaii, December 6, 2018.

Respectfully submitted,

/s/ Mateo Caballero
Mateo Caballero

ACLU OF HAWAII FOUNDATION

Elizabeth Kristen*
J. Cacilia Kim*
Kim Turner*

LEGAL AID AT WORK

Jayma M. Meyer*
Harrison J. Frahn, IV*

SIMPSON THACHER & BARTLETT LLP

*Attorneys for Plaintiffs*

*pro hac vice forthcoming*