ACLU OF HAWAII FOUNDATION

Mateo Caballero                    #10081
Jongwook "Wookie" Kim              #11020
P.O. Box 3410
Honolulu, Hawaii 96801
Telephone:  (808) 522-5908
Facsimile:  (808) 522-5909
E-mail:     mcaballero@acluhawaii.org
            wkim@acluhawaii.org

LEGAL AID AT WORK

Elizabeth Kristen, *pro hac vice*
J. Cacilia Kim, *pro hac vice*
Kim Turner, *pro hac vice*
180 Montgomery Street, Suite 600
San Francisco, CA 94104
Telephone:  (415) 864-8848
Facsimile:  (415) 593-0096
E-mail:     ekristen@legalaidatwork.org
            ckim@legalaidatwork.org
            kturner@legalaidatwork.org

SIMPSON THACHER & BARTLETT LLP

Jayma M. Meyer, *pro hac vice*
425 Lexington Avenue
New York, NY 10017
Telephone:  (212) 455-3935
Facsimile:  (212) 455-2502
E-mail:     jmeyer@stblaw.com

Harrison J. Frahn IV, *pro hac vice*
Wyatt A. Honse, *pro hac vice*
2475 Hanover Street
Palo Alto, California 94304
Telephone:  (650) 251-5000
Facsimile:  (650) 251-5002
E-mail:     hfrahn@stblaw.com
            wyatt.honse@stblaw.com

*Attorneys for Plaintiffs*

Case No. 1:18-cv-00477-LEK-RT

[CIVIL RIGHTS ACTION]

[CLASS ACTION]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| A.B., by her parents and next friends, C.B. and D.B., and T.T., by her parents and next friends, K.T. and S.T.,<br><br>           Plaintiffs,<br><br>     vs.<br><br>HAWAII STATE DEPARTMENT OF EDUCATION and OAHU INTERSCHOLASTIC ASSOCIATION,<br><br>           Defendants. | Case No. 1:18-cv-00477-LEK-RT<br><br>[CIVIL RIGHTS ACTION]<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>[CLASS ACTION] |

# TABLE OF CONTENTS

| | | |
|---|---|---|
| **I.** | **INTRODUCTION**...................................................................................1 | |
| **II.** | **OVERVIEW OF TITLE IX**....................................................................3 | |
| **A.** | **Effective Accommodation in Athletic Participation Opportunities**......4 | |
| **B.** | **Equal Treatment and Benefits**..................................................................5 | |
| **C.** | **Retaliation**..................................................................................................7 | |
| **III.** | **STATEMENT OF FACTS**......................................................................7 | |
| **A.** | **Defendants Fail to Provide Girls with Equal Participation Opportunities**.............................................................................................8 | |
| **B.** | **Defendants Fail to Provide Girls with Equal Treatment and Benefits**12 | |
| | 1. | Locker Rooms, Practice Facilities, and Competition Facilities..........12 |
| | 2. | Equipment and Supplies......................................................................17 |
| | 3. | Scheduling of Games and Practice Times............................................18 |
| | 4. | Coaching..............................................................................................20 |
| | 5. | Medical and Training Services.............................................................21 |
| | 6. | Travel Benefits and Opportunities.......................................................21 |
| | 7. | Publicity and Promotion......................................................................22 |
| **C.** | **Defendant DOE Retaliates Against Plaintiffs and Class Members**......23 | |
| **IV.** | **ARGUMENT**...........................................................................................26 | |
| **A.** | **The Class Satisfies the Requirements of Rule 23(a)**..............................26 | |
| | **1.** | **The Class is So Numerous That Joinder is Impracticable**...........26 |
| | **2.** | **The Class Shares Common Questions of Law or Fact**..................28 |
| | **3.** | **The Class Representatives' Claims Are Typical of the Class**.......31 |
| | **4.** | **The Class Representatives Will Adequately Represent the Interests of the Class**...................................................................33 |
| **B.** | **The Class Satisfies Rule 23(b)(2) and Rule 23(b)(1)(B)**.........................36 | |
| **V.** | **CONCLUSION**.........................................................................................38 | |

# TABLE OF AUTHORITIES

## Cases

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997)........................................................................................ 34, 38

*Amone v. Aveiro*,
  226 F.R.D. 677 (D. Haw. 2005)............................................................................27

*Barrett v. West Chester Univ.*,
  No. Civ. A. 03-CV-4978, 2003 WL 22803477
  (E.D. Pa. Nov. 12, 2003)..........................................................................................5

*Biediger v. Quinnipiac Univ.*,
  No. 3:09cv621, 2010 WL 2017773 (D. Conn. May 20, 2010).................. 3, 27, 37

*Boucher v. Syracuse Univ.*,
  No. 95-CV-620, 1996 WL 328441 (N.D.N.Y. June 12, 1996),
  *vacated on other grounds*, 164 F.3d 113 (2d Cir. 1999) ......................................38

*Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*,
  917 F.2d 1171 (9th Cir. 1990) ...............................................................................28

*Chelius v. Azar*,
  1:17-cv-00493-JAO-RT (D. Haw. 2017)...............................................................36

*Cohen v. Brown Univ.*,
  991 F.2d 888 (1st Cir. 1993)......................................................................................5

*Communities for Equity v. Mich. High Sch. Athletic Ass'n*,
  192 F.R.D. 568 (W.D. Mich. 1999)........................................................... 3, 27, 37

*Crawford v. Honig*,
  37 F.3d 485 (9th Cir. 1994) ...................................................................................34

*Cruz v. Alhambra Sch. Dist.*,
  No. CV 04-1460 DT (Mcx),
  Dkt. No. 51 (C.D. Cal. Oct. 4, 2004)........................................................ 3, 36, 38

*Davis v. Abercrombie*,
  No. 11–00144 LEK–BMK, 2014 WL 4956454 (D. Haw. Sept. 30, 2014)..........29

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
  431 U.S. 395 (1977)..............................................................................................31

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ...............................................................................33

*Emeldi v. Univ. of Or.*,
  698 F.3d 715 (9th Cir. 2012) ..................................................................................7

*Foltz v. Del. State Univ.*,
  269 F.R.D. 419 (D. Del. 2010) .............................................................................27

*Gen. Tel. Co. of the Nw., v. E.E.O.C.*,
  446 U.S. 318 (1980)................................................................................. 26, 31, 34

*Guckenberger v. Boston Univ.*,
  957 F. Supp. 306 (D. Mass. 1997).........................................................................28

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .......................................................... 28, 31, 32, 33

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005)................................................................................................7

*Jones v. Shalala*,
  64 F.3d 510 (9th Cir. 1995) ..................................................................................31

*Jordan v. Los Angeles Cty.*,
  669 F.2d 1311 (9th Cir. 1982), *vacated and remanded on other grounds*,
  459 U.S. 810 (1982)..............................................................................................27

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) ..............................................................................31

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) ........................................................................ 34, 35

*Mansourian v. Regents of Univ. of California*,
  602 F.3d 957 (9th Cir. 2010) ..............................................................................4, 6

*Martin v. City & Cty. of Honolulu*,
  No. 15-00363 HG-KSC, 2016 WL 4579128 (D. Haw. Aug. 15, 2016)...............38

*Martin v. City and County of Honolulu*,
    1:15-cv-00363-HG-KSC (D. Haw. 2015) ............................................................36

*Ollier v. Sweetwater Union High Sch. Dist.*,
    251 F.R.D. 564 (S.D. Cal. 2008) ..............................................................................6

*Ollier v. Sweetwater Union High Sch. Dist.*,
    768 F.3d 843 (9th Cir. 2014) ......................................................................... passim

*Shipes v. Trinity Industries*,
    987 F.2d 311 (5th Cir. 1993) ................................................................................32

*Sorenson v. Concannon*,
    893 F. Supp. 1469 (D. Or. 1994) .................................................................... 30, 32

*Villon v. Marriott Hotel Servs.*,
    Civ. No. 08–00529 LEK–RLP, 2011 WL 2160483
    (D. Haw. May 31, 2011) ................................................................................ 32, 33

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..................................................................... 28, 34, 35, 37

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ..............................................................................29

**Statutes**

20 U.S.C. § 1681 ..........................................................................................................1

34 C.F.R. § 100.7(e) .....................................................................................................7

34 C.F.R. § 106.41(c) ............................................................................................ 4, 5, 6

**Other Authorities**

44 Fed Reg. 71,413 *et seq.* ................................................................. 4, 5, 6, 7, 32, 33

7AA Wright & Miller et al., Fed. Prac. & Proc. § 1774 (3d ed.) ............................43

Clarification of Intercollegiate Athletics Policy Guidance:
    The Three Part Test at 9-11 (1996) ("Clarification"),
    *available at* https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html ...........6

Fed. R. Civ. P. 23 ............................................................................................. 28, 37, 41

## I.     INTRODUCTION

> I am part of this lawsuit because I want things to change for girls . . . .
> All of the inequities in the athletic program at Campbell have really
> impacted my time here. . . . I'd rather have spent the time studying,
> playing sports and focusing on my next win. I want the generations
> that come after me to get what I didn't receive and experience good
> memories of Campbell athletics.

> Declaration of Plaintiff T.T. ("T.T. Decl.") ¶ 44.

Plaintiff T.T.'s poignant words show the magnitude of the problems for

female student athletes at James Campbell High School ("Campbell"). Despite the

longstanding and well-settled mandates of Title IX of the Education Amendments

of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), Defendants Hawaii State

Department of Education ("DOE") and the Oahu Interscholastic Association

("OIA") (collectively, "Defendants")[1] unlawfully discriminate against female

athletes at Campbell. The unlawful treatment infects Campbell's athletic program

as to the two fundamental ways Title IX requires equality. First, girls at Campbell

are offered 106 fewer opportunities to participate in sports than what they are

entitled to under Title IX. Second, Defendants relegate girls who do participate to

substandard—or *wholly non-existent—*athletic benefits and treatment. For example,

until recently, the boys had exclusive use of a stand-alone locker facility located

near the athletic fields with showers and lockers for male athletes. Girls had no

---

[1] Plaintiffs seek certification of all claims as to DOE and Counts I and II as to OIA.

such facility and were instead provided with porta-potties that were often locked. Compared to the boys' teams, Campbell's girls' teams receive less and lower-quality equipment and supplies, less access to and reduced quality coaching, medical, and training services, fewer and lower-quality travel opportunities, and less desirable practice and competition schedules, all while being essentially ignored in the school's publicity and promotion efforts. Finally, DOE subjected Plaintiffs to retaliation when they complained about discrimination in athletics.

Plaintiffs, varsity female athletes attending Campbell, bring this action on behalf of present and future female Campbell students to remedy these unjust and illegal disparities and unlawful conduct. Plaintiffs seek class-wide declaratory and injunctive relief against Defendants and request class certification pursuant to Federal Rule of Civil Procedure 23.

The proposed class ("Class")—*i.e.*, "all present and future Campbell female students and potential students who participate, seek to participate, and/or are or were deterred from participating in athletics at Campbell"—satisfies all of the legal requirements for class certification under Rules 23(a) and 23(b). Compl. ¶ 186. *First*, the Class, consisting of hundreds of current and thousands of future and potential female athletes, is so numerous that joinder of all members is impracticable. *Second*, because Defendants' conduct deprives *all* members of the Class with the equal treatment, benefits, and opportunities to which they are

2

entitled under Title IX, and because Title IX requires a *program-wide* assessment of *all* athletic offerings, common questions of law and fact predominate. *Third*, the named Plaintiffs, current Campbell students who compete on multiple sports teams during multiple seasons, present claims of unequal opportunities, treatment, and benefits typical of the Class. *Fourth*, along with their counsel, the named Plaintiffs will fairly and adequately represent and protect the interests of the Class. *Finally*, because Defendants have acted on grounds generally applicable to the entire Class, declaratory and injunctive relief under Rule 23(b) is appropriate.[2] Accordingly, Plaintiffs respectfully request that this Court certify the Class.

## II.    OVERVIEW OF TITLE IX

Title IX prohibits educational programs that receive federal financial assistance from discriminating against students on the basis of sex. The regulations

---

[2] Under similar circumstances, courts routinely find that class certification is appropriate and necessary for the efficient and fair adjudication of Title IX civil rights actions. *See, e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 251 F.R.D. 564, 566 (S.D. Cal. 2008) (certifying class of "[a]ll present and future CPHS female students and potential students who participate, seek to participate, and/or were deterred from athletics at CPHS"); *Cruz v. Alhambra Sch. Dist.*, No. CV 04-1460 DT (Mcx), Dkt. No. 51 (C.D. Cal. Oct. 4, 2004)) (same) (attached to Declaration of Elizabeth Kristen ("Kristen Decl.") ¶ 33 as Exh. L); *see also Biediger v. Quinnipiac Univ.*, No. 3:09cv621, 2010 WL 2017773, at *8 (D. Conn. May 20, 2010) (same); *Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 192 F.R.D. 568, 570, 575 (W.D. Mich. 1999) (same).

3

require compliance in two broad areas: participation opportunities and equal

benefits and treatment. Title IX also prohibits retaliation.

### A.  Effective Accommodation in Athletic Participation Opportunities

Under Title IX, federally-funded schools must accommodate girls with

"equal athletic opportunity." 34 C.F.R. § 106.41(c). Courts employ a three-part test

delineated in the Department of Education's 1979 Policy Interpretation of Title IX,

44 Fed. Reg 71,413 (the "Policy Interpretation") to determine if an institution that

receives federal funds is compliant with Title IX's "effective accommodation

requirement." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 854 (9th

Cir. 2014) (reviewing Policy Interpretation). An athletic program complies with

Title IX if it demonstrates it meets at least one part of the three-part test. *Id*. To

comply with the first part of the test, an institution must show its athletic

participation opportunities are "substantially proportionate" to enrollment and the

levels of competition provided boys and girls are equitable. *See Mansourian v.

Regents of Univ. of California*, 602 F.3d 957, 964-65, 973 (9th Cir. 2010).

If an institution fails to prove numerical proportionality, the school may

show as an affirmative defense that it has a history and continuing practice of

program expansion. *Id.* at 965-66. This "history and continuing practice" defense

means a school must show ongoing increases in participation opportunities for

4

females. *See, e.g.*, *Barrett v. West Chester Univ.*, No. Civ. A. 03-CV-4978, 2003 WL 22803477, at \*7 (E.D. Pa. Nov. 12, 2003).

If a Title IX defendant fails to show either substantial proportionality or a history of continuing athletic program expansion, it can still avoid liability by showing that "the interests and abilities of the members of [the underrepresented sex] have been fully and effectively accommodated by the present program." *Ollier*, 768 F.3d at 854 (quoting Policy Interpretation, 44 Fed. Reg. at 71,418).[3] This part of the test requires a defendant to show there is no unmet interest and "the *selection of sports and levels of competition* effectively accommodate the interests and abilities of members of both sexes." *See* 34 C.F.R. § 106.41(c)(1) (emphasis added). "If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test." *Cohen v. Brown Univ.*, 991 F.2d 888, 898 (1st Cir. 1993).

### B.    Equal Treatment and Benefits

Under Title IX, schools must also provide "equal treatment and benefits" to girls in their athletic programs. *See* Policy Interpretation, 44 Fed. Reg. at 71,415.

---

[3] *See also* Clarification of Intercollegiate Athletics Policy Guidance: The Three Part Test at 9-11 (1996) ("Clarification"), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html; 44 Fed Reg. at 71,418.

5

Equal treatment encompasses "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided [to] male and female athletes." *Mansourian*, 602 F.3d at 964-65 (quoting Clarification). Factors courts evaluate to assess equitable treatment and benefits include, but are not limited to, equipment and supplies; scheduling of games and practice time; quality and number of coaches; locker rooms, practice, training and competitive facilities; and publicity. *See* 34 C.F.R. § 106.41(c)(2)-(10).

An inquiry into equal treatment and benefits is not, however, determined by any one specific factor. "Compliance in the area of equal treatment and benefits is assessed based on an *overall comparison* of the male and female athletic programs, including an analysis of recruitment benefits, provision of equipment and supplies, scheduling of games and practices, availability of training facilities, opportunity to receive coaching, provision of locker rooms and other facilities and services, and publicity." *Ollier v. Sweetwater Union High Sch. Dist.,* 858 F. Supp. 2d 1093, 1110 (S.D. Cal. 2012) (emphasis added) (citing 34 C.F.R. 106.41(c)); *see also* Policy Interpretation, 44 Fed. Reg. 71,417 ("5. *Overall Determination of Compliance* [Compliance is assessed by examining] . . . b. Whether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program *as a whole*." (emphasis added)).

6

## C.    Retaliation

Title IX also prohibits retaliation against those who complain of sex

discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74, 178

(2005) ("Title IX's private right of action encompasses suits for retaliation,

because retaliation falls within the statute's prohibition of intentional

discrimination on the basis of sex."); *see also* 34 C.F.R. § 100.7(e). A plaintiff

makes out a "*prima facie* case of retaliation by showing (a) that he or she was

engaged in protected activity, (b) that he or she suffered an adverse action, and (c)

that there was a causal link between the two." *Ollier*, 768 F.3d at 867 (citing

*Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012)). In *Ollier*, the Ninth

Circuit recognized a female athlete class could pursue class-wide retaliation claims

based on specific adverse actions taken against a subset of the class. *Id.* at 866-69.

## III.    STATEMENT OF FACTS

Defendants unlawfully discriminated and continue to discriminate against

named Plaintiffs and the Class in their respective inequitable provision of

opportunities, treatment, and benefits, consigning Campbell's girls to a second-

class status and retaliating against them when they raised their concerns. Title IX

prohibits such conduct. Therefore, class certification is appropriate here.

7

### A. Defendants Fail to Provide Girls with Equal Participation Opportunities

Defendants have discriminated, and continue to discriminate, against Plaintiffs and the Class by failing to provide Class members with equal athletic participation opportunities. *See* Compl. ¶¶ 210-225 (Count II).

Between the 2015-2016 and 2018-2019 academic years, Campbell had an average of 3,104 students enrolled. *See* Kristen Decl. Exh. A.[4] During these years, on average, female students constituted 48 percent of the student body. *Id*. In contrast, female athletes constituted only 39.1 percent of all athletes. *Id*. Exh. B.[5] Thus, Campbell has a participation gap of 8.9 percent, amounting to 106 individual participation opportunities not provided to girls. *Cf. id*. ¶ 22 & Exh. K (April 23, 2019 Deposition of Raymond Fujino ("Fujino Dep., Apr. 23, 2019") at 20:1-24 (admission by Raymond Fujino, OIA Executive Director and DOE Athletics Administrator Officer, that schools currently and previously have had a 4-6% participation gap).

---

[4] DOE has not produced complete enrollment numbers for Campbell. For that reason, the enrollment average includes some best estimates. *See* Kristen Decl. at ¶ 6 (explaining methodology), Exh. A.

[5] DOE has not produced complete participation data for Campbell. For that reason, the participation data includes some best estimates. *See* Kristen Decl. at ¶ 7 (explaining methodology), Exh. B.

Defendants also have no history and continuing practice of expanding the athletic programs in response to the developing interests and abilities of female athletes. DOE has made *no efforts* to expand athletic opportunities for girls in the past five years. *See id.* ¶ 20 & Exh. I (March 22, 2019 Deposition of Nicole Isa-Iiijima ("Isa-Iijima Dep., March 22, 2019")) at 836:14-19; *Id.* ¶ 22 & Exh. K (Fujino Dep., April 23, 2019 at 22:22-23:3 & 32:23-33:4) (no sports added in the last five to ten years). One of the last sports added at Campbell in 2003 was girls' water polo. *See id.* ¶ 20 & Exh. J (April 22, 2019 Deposition of Nicole Isa-Iijima at 46:8-16).

Campbell's participation gap—the difference between the share of female enrollment and the share of female athletic participation—has *grown* over the last three years:

| Three-Year Comparison of Campbell Participation Gap | | | |
|---|---|---|---|
| **School Year** | *2016-2017* | *2017-2018* | *2018-2019* |
| **Total Enrollment** | 3,133 | 3,123 | 3,104 |
| **Number of Male Athletes** | 374 | 403 | 321 |
| **Number of Female Athletes** | 279 | 269 | 198 |

| | | | |
|---|---|---|---|
| **Percent of Female Enrolled Students** | 48.13% | 48.22% | 48.06% |
| **Percent of Female Athletes** | 42.73% | 40.03% | 38.15% |
| **Participation Gap** | 5.41% | 8.19% | 9.91% |
| **Girls' Participation Opportunities Lacking** | 68 | 106 | 99 |

Campbell has not added any athletic teams or levels for teams during Plaintiffs' four years at the school. T.T. Decl. ¶10; *see also* Kristen Decl. ¶ 14 & Exh. E (OIA000154; OIA000326; OIA000499 (showing same number of teams from 2016-2017 through 2018-19)). Campbell is not engaged in the "kind of 'steady march forward' that an institution must show to demonstrate Title IX compliance" under the test's second part. *Ollier,* 768 F.3d at 857-58.

Finally, DOE cannot show girls' interests and abilities to participate have been and currently are met at Campbell.

Defendants have not administered a survey on student interest in athletics in nearly two decades. *See* Kristen Decl. ¶ 13 & Exh. D (DOE Response to Plaintiffs' Interrogatories, at 6 (noting a single, statewide student interest survey performed "[d]uring the 2000-2001 School Year" since the 1978-79 school year)). DOE has

10

failed to make any other efforts to assess girls' interest in participating in athletics in greater numbers. Even when DOE had a focus group of female athletes, it failed to ask them questions about athletic participation and additional sports they wished to play. *See* Kristen Decl. ¶ 11 & Exh. C (DOE 00033-48).

In the meantime, girls' athletic interests are not met. For example, this last season, girls were cut from the volleyball and softball programs, and possibly also from soccer and basketball. *Id.* ¶ 18 & Exh. G (March 20, 2019 Deposition of Rory Pico ("Pico Dep., March 20, 2019") at 260:18-261:18); *Id*. ¶ 19 & Exh. H (March 21, 2019 Deposition of John Henry Lee ("Lee Dep., March 21, 2019") at 549:11-550:12). Additionally, a few years ago, there was a co-ed jiu-jitsu club at Campbell, which was disbanded after the teacher-coach left. *Id*. ¶ 19 & Exh. H (Lee Dep., March 21, 2019 at 527:15-530:2).

The lack of athletic opportunities affects all female athletes and potential athletes alike. For example, Plaintiff T.T. would have considered playing a number of additional sports if Campbell had offered them, including field hockey, powder puff football, rugby, lacrosse, and mixed martial arts or jiu-jitsu. T.T. Decl. ¶ 7. Her female friends on the water polo team (putative class members) also would be interested in powder puff football. *Id.* ¶ 8. T.T. knows that girls at Campbell would participate in existing sports in greater numbers if there were more opportunities and better locker facilities. *Id.* ¶ 9.

11

Defendants unlawfully provide fewer athletic opportunities to *all* female students at Campbell and cannot avoid liability by claiming either a history and continuing practice of program expansion or full accommodation of girls' interests and abilities. Thus, the Class adequately asserts claims of unequal participation opportunities against Defendants under Title IX and certifying the Class is appropriate.

## B.    Defendants Fail to Provide Girls with Equal Treatment and Benefits

Defendants unlawfully discriminate against Plaintiffs and the Class by failing to provide Class members with equal treatment and benefits. *See* Compl. ¶¶ 199-209 (Count I). The experience of the girls' water polo team—which was created to "close the participation gap"—is emblematic of Campbell's treatment of girls' sports.

### 1.    Locker Rooms, Practice Facilities, and Competition Facilities

Plaintiffs and the Class are provided with unequal locker rooms, practice facilities, and competition facilities.

#### A.    *Locker Rooms*

Female athletes—including Plaintiffs—have never had equal access to Campbell's only athletic locker room. Until the month this lawsuit was filed, female athletes at Campbell had *no access whatsoever* to this locker room. *See* Kristen Decl. ¶ 11 & Exh. C (DOE 00033-36 ("Isa-Iijima Report") at DOE 00033

12

(noting while all students had access to the school's P.E. locker rooms, "[t]here is *no athletic locker room for the girls*" (emphasis added))); *see also id*. ¶ 19 & Exh. H (Lee Dep., March 21, 2019 at 608:5-13 (citing December 4, 2018 as the first time female athletes had locker room access)). For years, female athletes carried their gear around with them all day and resorted to changing under the bleachers, in classroom closets, in hallways with lookouts, in fast food restaurants, and in porta-potties on the field, which they describe as "disgusting." *See id*. ¶ 11 & Exh. C (Isa-Iijima Report at DOE 00033, DOE 00035); *see also id*. ¶ 19 & Exh. H (Lee Dep., March 21, 2019 at 634:15-635:1 (describing students changing in fast food restaurants as "a concern" and "a safety thing")). Female athletes were carrying around their gear all day and female athletes lacked clean and adequate restroom facilities near the softball field. T.T. Decl. ¶¶ 14-15; *see also* Kristen Decl. ¶ 11 & Exh. C (Isa-Iijima Report at DOE 00034-35); Declaration of C.B. ("C.B. Decl.") ¶ 20 ("[T]he mistreatment is one that affects practically all female athletes at Campbell."). Female wrestlers and judo athletes also complained about lacking privacy during weigh-ins due to lacking facilities. Declaration of A.B. ("A.B. Decl.") ¶ 19. Girls on the track team said they had no place to change, reduced to

13

changing behind bleachers or at a local fast food restaurant.  T.T. Decl. ¶ 15;

Declaration of K.T. ("K.T. Decl.") ¶ 12; *see also* A.B. Decl. ¶¶ 19.[6]

     B.   *Practice Facilities*

Campbell's female student-athletes lack equal practice facilities, or in some

cases, any facilities at all. For example, during the 2017-18 school year, DOE

failed to secure a pool for the girls' water polo program until after the season had

begun. *See* Kristen Decl. ¶ 11 & Exh. C (Isa-Iijima Report at DOE-00036 (noting,

in April 2018, that "[t]he water polo team does not have a pool")); T.T. Decl. ¶ 21,

A.B. Decl. ¶ 14; Declaration of D.B. ("D.B. Decl.") ¶ 15. As a result, the team had

to resort to dry-land and open-ocean training sessions and played at least two

regular season games without any access to a pool. D.B. Decl. ¶¶ 15-18; C.B. Decl.

¶ 12; T.T. Decl. ¶¶ 21; Kristen Decl. ¶ 19 & Exh. H (Lee Dep., March 21, 2019 at

565:2-19). The team experienced similar problems for "at least the past five years"

(and potentially longer). D.B. Decl. ¶ 14; *see also* T.T. Decl. ¶ 25; K.T. Decl. ¶ 5;

Declaration of S.T. ("S.T. Decl.") ¶ 6.

Those facilities provided to girls' teams are in many cases grossly unequal to

those provided boys' programs. The boys' baseball program, for example, has

---

[6] Campbell now claims to permit female athletes to use the athletic locker room, but for reasons that will be explained at the merits stage, that arrangement is still inequitable.

14

exclusive access to a batting cage, the stand-alone locker facility equipped with restrooms, and, until recently, a "baseball house" with storage space for supplies. *See* Kristen Decl. ¶ 11 & Exh. C (Isa-Iijima Report at DOE 00033 ("[T]he baseball team has both a container and a 'baseball house' [adjacent to the baseball field] where they can change and store their belongings.")); A.B. Decl. ¶ 26; K.T. Decl. ¶ 11. The girls' softball team has an inferior decrepit batting cage, no access to nearby restroom facilities, and no "softball house." *See* Kristen Decl. ¶ 11 & Exh. C (Isa-Iijima Report at 00033 ("The softball team has a container that . . . is small and when it rains, the equipment gets wet.")). The softball teams' storage facility was also not secure. T.T. Decl. ¶15. This same "boys-first" mentality also applies to facility maintenance. *See, e.g.*, Kristen Decl. ¶ 11 & Exh. C (Isa-Iijima Report at DOE-00048 ("They didn't fix our bleachers or our lights, but the football team could get that.")). Similar to softball, the pool facilities Campbell provides are inadequate. Campbell's water polo team is forced to share a non-regulation-sized pool and practice at the same time with their competitors. T.T. Decl. ¶ 20. Contrary to the experiences of members of girls' sports teams, boys' sports teams across the board do not experience any issues with facilities. A.B. Decl. ¶ 27 (summarizing discussions with members of the boys' football, soccer, and baseball teams).

15

The allocation of athletic facilities demonstrates a similarly "boys-first" mentality. The weight room is predominately filled by male athletes every fall. Kristen Decl. ¶ 11 & Exh. C (Lee Dep., March 21, 2019 at 709:17-710:11 (explaining "[s]eventy to eighty percent" of athletes in the weight room in the fall are typically male). Monthly locker room schedules show between March 2018 and February 2019, a total of 326 hour-long time slots were designated for boys-only sports, whereas *fewer than half as many* (143) were designated for girls-only sports. *See* Kristen Decl. ¶ 11 & Exh. C (SOH DOE 02699-717). Plaintiffs T.T. and A.B. also experienced this "boys-first" mentality. This year, water polo was scheduled to use the weight room—which "would have been appropriate and useful for the team," D.B. Decl. ¶ 16—but they were displaced by male football players. T.T. Decl. ¶ 29.

C.   *Competition Facilities*

Defendants also consistently and unfairly allocate competitive facilities to boys' programs over girls' programs. For example, for at least the last three years, OIA has secured Aloha Stadium, the state's pre-eminent sports stadium, for the OIA football championship. *See* Kristen Decl. ¶ 14 & Exh. E (OIA000391 (2018-19); OIA000219 (2017-18); OIA000047 (2016-17)); *id*. at ¶ 22 & Exh. K (Fujino Dep. Apr. 23, 2019 at 90:7-10; 92:7-12 (affirming "only football" uses the Stadium for championships, with capacity for 10,000-20,000 spectators, with no girls'

16

teams scheduled to play championships at an equivalent venue)). By contrast, no

girls' team has competed at Aloha Stadium. *See also id.* at ¶ 14 & Exh. E

(OIA000390-91; 218-19; 46-47 (showing prior baseball championships occurred at

"Hans L'Orange," "CORP," and now at "UH Les Murakami" whereas softball

championships occur at the inferior McKinley High School stadium)); *id.* at ¶ 22 &

Exh. K (Fujino Dep. Apr. 23, 2019 at 89:12-17 (admitting boys' baseball

championship venue is "a nicer facility" compared to girls' softball championship

venue)).

### 2.     Equipment and Supplies

Campbell's female athletes are provided with inadequate equipment and

supplies when measured against those provided boys. For example, DOE has

consistently failed to provide proper gear for Plaintiffs, forcing parents to use their

own funds to supply the team. T.T. Decl. ¶ 34; D.B. Decl. ¶ 28; Kristen Decl. ¶ 17

& Exh. F (March 19, 2019 Deposition of Raymond Fujino ("Fujino Dep. March

19, 2019") at 113:3-8 (stating that there is no DOE policy regarding the types of

equipment, supplies, and uniforms that must be provided to student athletes)).

When a team gets adequate equipment and supplies, it is only after "continuous

lobbying" by the team. D.B. Decl. ¶ 28. The girls' soccer program receives the

same inequitable treatment, having to piece together equipment and gear on their

own. *See* Kristen Decl. ¶ 11 & Exh. C (Isa-Iijima Report at DOE 00035 ("The

17

soccer girls said they have had the same uniform for four years.")). Notably, Campbell lacks a "uniform rotation schedule" for replacement purposes. *Id*. at ¶ 18 & Exh. G (Pico Dep. March 20, 2019 at 437:7-10). Female judo and wrestling athletes have mats that "do not fully cover the ground" and "[o]ne of the wrestling/judo athletes landed on the cement." *Id*. at ¶ 11 & Exh. C (DOE 00035). In sum, female athletes are disproportionally burdened with inferior equipment and supplies throughout the program. *See id*. ("Questions for Female Student Athletes," at DOE 00048 ("The football team is prioritized over all sports.")); A.B. Decl. ¶ 27 (when members of the boys' football, soccer, and baseball teams were asked about "any issues with things like equipment, facilities, and support[,]" they "all responded 'no' with zero hesitation"). By contrast, "none of the boys . . . fe[el] like they [a]re being mistreated by DOE." A.B. Decl. ¶ 27.

### 3.   Scheduling of Games and Practice Times

Campbell's female athletes are subject to inequitably scheduled game and practice opportunities in comparison to their male counterparts. Some of Campbell's girls' teams rarely play on Friday or Saturday nights and are typically relegated to less ideal days. For example, during the 2016-17 school year, the girls' basketball program played 20% of their regular season games on either Fridays or Saturdays. Kristen Decl. ¶ 11 & Exh. C (DOE RPD 00146). In contrast, that same season the boys program played over 45% of their games on either Fridays or

18

Saturdays. *Id.* (DOE RPD 00152). Further, the season for boys' football is longer than for any girls' sport. *Id*. (SOH DOE 02707-15; SOH-DOE-02702-04 (2018-19 calendar reflects football practicing from July to at least November and from March to May)).

For girls' and boys' sports that share competition venues on the same days, Defendants tend to give priority to boys. For example, for cross country races, the OIA handbook states that both varsity and junior varsity girls are to run before the boys. *Id*. at ¶ 14 & Exh. E (OIA000442-43); *see also id*. (OIA000480-84 (OIA rules for track and field has all girls' relays occurring before boys' relays)); *id.* (OIA000466-68 (OIA rules for soft tennis championships has girls competing before the boys)).

The same inequitable treatment to female athletes is applied in the scheduling of practices. For example, the girls' basketball team is often consigned to a later, more inconvenient practice time than the boys' basketball team. *See id*. at ¶ 18 & Exh. G (Pico Dep., March 20, 2019 at 398:9-399:10). In addition, during the 2015-2017 school years, water polo practice was between 6:00 p.m. and 8:00 p.m. because of the shared use of facilities, and during the 2017-2018 school year, water polo also generally had late practices. Having such late off-campus practices (instead of practicing right after school) is more difficult for student athletes, since it often requires athletes to go home before practice. T.T. Decl. ¶ 32.

19

### 4.   Coaching

Female student-athletes at Campbell have fewer opportunities to receive coaching in comparison to male athletes. For one, girls experience discrimination such that gaps in coaching positions for girls' sports are not timely filled as compared to coaching positions for boys' sports. *See* D.B. Decl. ¶¶ 29-33. For example, the girls' water polo team has had "four different head coaches in the last five years." *Id*. at ¶ 29. Campbell has "shown no urgency" in timely securing replacement coaches, although qualified candidates exist and have expressed interest. S.T. Decl. ¶ 7; D.B. Decl. ¶ 30. When water polo lacked a coach during the 2017-2018 season, Campbell did not bother to contact prior assistant coaches to ask them to coach. S.T. Decl. ¶ 7. Further, Campbell did not compensate some of the coaching staff for the girls' water polo team. D.B. Decl. ¶ 31; S.T. Decl. ¶ 8. Campbell appears to have used that money to provide more compensation to boys' football coaches and hire more assistant coaches for that team. S.T. Decl. ¶ 8. Water polo athletes constantly have to "re-start" and adjust to new coaching styles, which can be challenging. T.T. Decl. ¶ 33; *see also* A.B. Decl. ¶ 16; D.B. Decl. ¶ 29. Campbell male sports teams, by contrast, do not suffer such poor treatment. S.T. Decl. ¶ 7; D.B. Decl. ¶ 32 ("I am not aware of any assistant coach for a boys' sports team that has been unpaid in the same way."). Instead, the Athletic Director

20

"busts his butt to put together a deep, experienced bench of coaches for the boys' football and baseball teams." C.B. Decl. ¶ 19.

### 5.    Medical and Training Services

Campbell provides inequitable medical attention to its female athletes. For example, until this year, Campbell athletic trainers rarely, if ever, attended water polo games despite the team's need for a trainer. T.T. Decl. ¶ 30. Based on the limited interactions the water polo athletes have had with the trainers, the trainers also appeared unfamiliar with details about water polo. T.T. Decl. ¶ 31. By contrast, upon information and belief, at least one trainer attends every boys' football game or boys' baseball game. Compl. ¶ 136.

### 6.    Travel Benefits and Opportunities

Campbell provides inequitable travel benefits and opportunities for Campbell's female athletes. To illustrate, during the 2018-19 school year, the boys' varsity football team traveled to Phoenix, Arizona, for a six-day trip to play football in Phoenix at a cost of $69,700 and included the attendance of Campbell's athletic trainers. Kristen Decl. ¶ 11 & Exh. C (DOE RPD 00326-327)*; see also* Lee Dep., March 21, 2019 at 713:21 (explaining the football team "went to Arizona"). Neither Plaintiffs nor other Class members have had equivalent opportunities to travel off the island of Oahu or out of state for practice, competition. T.T. Decl. ¶ 15. Additionally, while the water polo team has to practice at a pool far from

school, the school does not provide any transportation to practice; instead, athletes must rely on parents or other students to make the 25-30 minute drive there and back. T.T. Decl. ¶ 26.

### 7. Publicity and Promotion

Defendants unlawfully discriminate against girls by consistently giving preferential treatment to, for example, the Campbell boys' football program and the boys' baseball program with respect to publicity, promotion, and scheduling.

Campbell's website "Photo Albums" page is instructive of the disparity between the promotion of girls' sports and boys' sports. Kristen Decl. ¶ 12 (regarding analysis of Campbell website "Photo Albums"). Of the approximate 600 photographs on the site, *all* of the athletics-related photos—more than 250 images—depict the boys' football program. *Id*. Not a single page in the photo album on the Campbell website features any girls' sports program. *Id*.

Cheerleading and band schedules demonstrate that both groups perform exclusively at boys' football games and related events, failing to appear for any girls' sports programs. Kristen Decl. ¶ 18 & Exh. G (Pico Dep., March 20, 2019 at 461:11-13 (cheer and band performed exclusively at football games)); T.T. Decl. ¶ 39 ("I have seen cheerleaders at football games but never at any girls' sports events."). Female athletes at Campbell believe that the school does not support girls' sports like it does boys' sports. *See* Kristen Decl. ¶ 11 & Exh. C (DOE 00047

22

("They seem[] to prioritize boys more.")). Here too, the experience of the girls'
water polo team is emblematic of Campbell's treatment of girls' sports. During
T.T. and A.B.'s entire career as high school water polo athletes, the former
Athletic Director attended one game and, even then, he disparaged the team and
said words to the effect of "Why have a water polo team if you're not going to
win?" T.T. Decl. ¶ 37. At school assemblies, in sports announcements, in school
yearbooks and in similar public support for athletes, female athletes are recognized
less often than male athletes. T.T. Decl. ¶ 38. During one athletic award ceremony
at which all sports were supposed to be recognized, Campbell failed to mention the
female water polo team. *Id.* At a pep rally, Campbell again failed to recognize the
achievements of water polo, although they advanced to the championships for the
first time. *Id.* Campbell generally promotes boys' football but not girls' sports. T.T.
Decl. ¶ 40; *see also* K.T. Decl. ¶ 6.

### C.    Defendant DOE Retaliates Against Plaintiffs and Class Members

When Plaintiffs raised their concerns regarding discrimination to Campbell
administrators, they were met with unlawful retaliation. Numerous times, Plaintiffs
raised concerns about gender inequity to the Campbell administration. C.B. Decl.
¶¶ 13-15 (noting four meetings with Campbell administrators, stating belief that
"the mistreatment of the girls' water polo team was an issue of gender
discrimination"); D.B. Decl. ¶¶ 19, 38-39.

23

Yet, instead of addressing the issues, Campbell retaliated against the water polo team. For example, after one meeting the team held with the Athletic Director and Principal to discuss the school's unfair treatment of girls, the administrators *three times* threatened to cancel the water polo team, the season, or both and/or told the girls to forfeit games. D.B. Decl. ¶ 42; A.B. Decl. ¶ 17; T.T. Decl. ¶ 42; K.T. Decl. ¶ 21; S.T. Decl. ¶¶ 15, 20; *see also* C.B. Decl. ¶ 29 (noting Campbell administration stated, "would you rather us cancel the season or forfeit the season?"). T.T. and K.T. (and others) were in tears after the Campbell administration made these threats. K.T. Decl. ¶ 21; *see also* S.T. Decl. ¶ 20 ("It was heartbreaking to hear our female student athletes express at that meeting with the Principal and Mr. Delos Reyes how unfair the situation was for them. I saw how my daughter and other girls were suffering from the sting of discrimination and it pained me too as a father."). Because the team was so upset, after the meeting, they collectively wrote a letter to the Principal and Athletic Director explaining how the girls' water polo team was being mistreated and how the Campbell administration "lacked respect for the  water polo athletes." T.T. Decl. ¶ 43. Campbell's conduct suggested to the girls that they were "unimportant" and that the school cared only about male athletes on the football team. S.T. Decl. ¶ 18.

Campbell also retaliated by increasing scrutiny of and withholding resources from the girls' water polo team. D.B. Decl. ¶ 43. That retaliation has included the

rejection of an opportunity to receive a donation for the team's use, as well as the sudden "disappearance" of half the team's required paperwork soon after one "heated meeting" between the team and the Campbell administration. D.B. Decl. ¶¶ 44-45.

These retaliatory acts came in direct response (and temporally close) to girls at Campbell engaging in protected activity—*i.e.*, raising sex discrimination concerns. D.B. Decl. ¶¶ 45 ("The closeness of this 'disappearance' [of the paperwork] to the heated meeting with the team . . . cannot be coincidence.").

Separately, after this lawsuit was filed, there was an all-staff meeting at Campbell during which DOE "outed" the identities of A.B. and T.T. C.B. Decl. ¶ 31. A teacher who attended that meeting told K.T. that Campbell administrators said, "Keep an eye on these guys" (meaning the Plaintiff families). K.T. ¶ 22. That teacher then warned, "be careful what you say, they talked about you at the staff meeting." *Id*. K.T. understood this to be a negative remark about the Plaintiffs' participation in this lawsuit. *Id*. The ongoing retaliation by the Campbell administration has had a "very negative impact on the girls' water polo team," who "feel like they are treated like second-class citizens." D.B. Decl. ¶ 46. Fortunately, since filing the lawsuit, Plaintiffs have been "overwhelmed by the positive support" from segments of the community for what Plaintiffs are trying to do on behalf of all female athletes at Campbell (and elsewhere). C.B. Decl. ¶ 30.

## IV.    ARGUMENT

Class certification is appropriate if named plaintiffs demonstrate that they and the Class satisfy all the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Plaintiffs and the Class meet and exceed these requirements. Accordingly, the Court should certify the Class.

### A.    The Class Satisfies the Requirements of Rule 23(a)

Rule 23(a) sets forth four prerequisites to maintaining a class action: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims . . . of the representative parties are typical of the claims . . . of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The Class here meets each of these four prerequisites.

#### 1.    The Class is So Numerous That Joinder is Impracticable

The Class of present, future, and potential female athletes at Campbell is so numerous that joinder of all its members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). Determining numerosity "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw., v. E.E.O.C.*, 446 U.S. 318, 330 (1980). "[W]here a class is large in numbers, joinder will usually be impracticable." *Jordan v. Los Angeles Cty*., 669 F.2d 1311, 1319-20 (9th Cir. 1982), *vacated and remanded on other grounds,* 459 U.S. 810 (1982).

26

During the last three school years, Campbell has had at least 200 to 278 female athletes. *See supra* at III.A. The number of current female athletes alone easily satisfies the numerosity requirement. *See, e.g.*, *Jordan*, 669 F.2d at 1319 n.10 (collecting cases in which certification was granted to classes with 75 or fewer members); *Amone v. Aveiro*, 226 F.R.D. 677, 683-84 (D. Haw. 2005) (noting that a proposed class of 40 members "or larger should meet the test of Rule 23(a)(1) on that fact alone" and certifying a class that could be, at smallest estimate, "less than 60" individuals (citation omitted)); *Biediger*, 2010 WL 2017773, at \*6 (at least 223 athletes in a Title IX class was "surely large enough" to satisfy numerosity).

In the Title IX context, courts certify classes consisting of present, future, and potential student-athletes as a matter of course. *See, e.g.*, *Foltz v. Del. State Univ.*, 269 F.R.D. 419, 422 (D. Del. 2010) (certifying class of potential and future college athletes even though the number "cannot be calculated with any specificity but is, indisputably, very large"); *Communities for Equity*, 192 F.R.D. at 571-72 (certifying a class that included future and deterred athletes, noting that "future class members are necessarily unidentifiable, and . . . their joinder is therefore impracticable" (citation omitted)). Courts have also noted that the inherently transitory nature of a student population typically necessitates class certification. *See Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 326-27 (D. Mass. 1997).

The Class of present, future, and potential Campbell female athletes satisfies the numerosity requirement of Rule 23(a)(1).

### 2.    The Class Shares Common Questions of Law or Fact

The members of the Class of present, future, and potential female athletes at Campbell share common questions of law and fact in their claims of unequal participation opportunities and treatment and benefits under Title IX, because their Title IX claims rest on the common contention that female athletes do not enjoy the same athletic opportunities, benefits, and treatment as their male counterparts.

To satisfy the commonality requirement, a class action plaintiff must demonstrate that their claims "depend upon a common contention . . . of such a nature that it is capable of class wide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). However, Rule 23 "does not require the named plaintiffs to be identically situated with all other class members. It is enough if their situations share a 'common issue of law or fact.'" *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990). The commonality requirement "has been construed permissively . . . . The existence of shared legal issues with divergent factual predicates is sufficient." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998).

The standard for commonality is particularly liberal where, as here, the plaintiffs seek "final injunctive relief . . . with respect to the class as a whole"

28

under Rule 23(b)(2). *Walters v. Reno*, 145 F.3d 1032, 1045 (9th Cir. 1998). Even where there are "factual differences among the potential class members," this "do[es] not defeat commonality because commonality does not require 'complete congruence.'" *Davis v. Abercrombie*, No. 11–00144 LEK–BMK, 2014 WL 4956454, at \*11 (D. Haw. Sept. 30, 2014) (citations omitted) (Kobayashi, J.).

The Class here satisfies the commonality requirement. On the merits, there are two questions to resolve in this case: (1) whether Defendants unlawfully discriminate against current and future female athletes by failing to provide them with equal opportunities, treatment, and benefits, and (2) whether they have been retaliated against for raising their concerns. As to the first question, Title IX requires examination of *program-wide* benefits and opportunities. Here, Plaintiffs' Title IX claims unquestionably encompass program-wide components of the athletic program. *See* Policy Interpretation, 44 Fed. Reg. at 71,417. Whether Campbell has failed to comply "in the area of equal treatment and benefits is assessed based on an *overall* comparison of the male and female athletic programs." *Ollier*, 858 F. Supp. 2d at 1110 (emphasis added). Here, the contention that Campbell does not provide equal opportunities, treatment, and benefits to female athletes is a question of fact and law common to the entire Class. With respect to retaliation, Plaintiffs allege retaliation not just against themselves, but against the Class. When parents and students raise Title IX concerns and the

29

administration threatens to cancel their whole water polo program, there is a chilling effect on the entire Class's ability to assert their civil rights and class-wide relief is appropriate. D.B. Decl. ¶ 46 ("The retaliation from the Campbell administration . . . has had a very negative impact on the girls' water polo team.").

Thus, whether there is unlawful sex-based discrimination in athletic opportunities, treatment, and benefits is a shared legal question, even if each Class member's experience with particular sports, coaches, or facilities varies. *See* Policy Interpretation, 44 Fed. Reg. at 71,422 ("[T]he regulation frames the general compliance obligations of recipients in terms of program-wide benefits and opportunities . . . . Title IX protects the individual as a student-athlete, not as a basketball player, or swimmer."); *cf. Sorenson v. Concannon*, 893 F. Supp. 1469, 1479 (D. Or. 1994) (finding commonality requirement satisfied even though each class member's specific injuries regarding the denial of Social Security benefits differed). Because the inequities the Class experiences regarding athletic treatment, benefits, and opportunities are shared across Class members, commonality is satisfied.

Further, many factual predicates underlying the inequities the Class experiences regarding athletic treatment, benefits, and opportunities, *are shared* across Class members. For example, the entire Class—all current, potential, and future Campbell female athletes—has fewer athletic opportunities as a result of the

school's glaring participation gap. *See supra* Section III.A. Similarly, the entire

Class is affected by the lack of adequate athletic facilities, including issues such as

the male-dominated weight room. *See supra* Section III.B. Inferior treatment and

benefits due to unequal publicity and promotion, and the "boys-first" approach to

scheduling and travel likewise affect every female athlete at the school. *Id*.

These shared experiences of discrimination and retaliation among the Class

constitute common questions of law and fact and indicate that Rule 23(b)(2)'s

commonality requirement is met. *See Hanlon*, 150 F.3d at 1019.

### 3.    The Class Representatives' Claims Are Typical of the Class

Plaintiffs' Title IX claims are typical of the Class. Under Rule 23(a)(3), class

representatives must form "part of the class and possess the same interest and

suffer the same injury as the class members," *Gen. Tel. Co. of Sw. v. Falcon*, 457

U.S. 147, 156 (1982) (citing *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431

U.S. 395, 403 (1977)), to ensure "the interest of the class representative 'aligns

with the interests of the class.'" *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th

Cir. 2017) (citations omitted); *see also Jones v. Shalala*, 64 F.3d 510, 514 (9th Cir.

1995) ("Typicality is an inquiry we undertake . . . to determine whether a named

plaintiff may represent a class"). "The threshold requirements of . . . typicality are

not high." *Sorenson*, 893 F. Supp. at 1479 (citing *Shipes v. Trinity Industries*, 987

F.2d 311, 316 (5th Cir. 1993)). Rather, "[u]nder the rule's permissive standards,

31

representative claims are 'typical' if they are reasonably co-extensive with those of

absent class members[.]" *Hanlon*, 150 F.3d at 1020. Indeed, "the named Plaintiffs'

claims do not have to be identical to the claims of all the class members" where

"claims arise from the same general fact pattern and rely on the same legal

theories." *Villon v. Marriott Hotel Servs*., Civ. No. 08–00529 LEK–RLP, 2011 WL

2160483, at *15-16 (D. Haw. May 31, 2011) (Kobayashi, J.).

        Named Plaintiffs are twelfth-grade Campbell students competing on the

girls' varsity water polo and swimming teams.[7] T.T. Decl. ¶¶ 4, 11, 13; A.B. Decl.

¶¶ 2-4, 6. Like the rest of the Class, Plaintiffs are subject to discriminatory,

unequal participation opportunities and treatment and benefits. For example, as

members of the water polo team, named Plaintiffs have been forced to pursue their

athletic interests without access to proper facilities or supplies, an injury they share

with members of the girls' soccer and softball teams, along with other female

athletes. *See supra* Section III.B. And, like all female athletes at Campbell, the

---

[7] Plaintiffs need not play every sport offered, at every level, to represent the class
as to the participation, treatment, and benefits claims. In *Cruz v. Alhambra*, the
named plaintiffs played softball and basketball, with another plaintiff aspiring
toward several sports, and were permitted to represent the class of current and
future female athletes with a class definition identical to that proposed here,
concerning participation, treatment, and benefits claims. Kristen Decl. ¶ 33 & Exh.
L. Likewise, in *Ollier*, the named plaintiffs played softball and basketball at the
time the suit was filed and were not required to play each and every sport in the
athletic program to maintain standing on behalf of themselves and the class of
current and future female athletes. 858 F. Supp. 2d 1093.

32

named Plaintiffs compete with the knowledge that their efforts are less prioritized and will not be promoted or publicized to the school, local, and wider communities to the extent of their male counterparts. *See supra* Section III.B. Plaintiffs also experience a lack of participation opportunities alongside Campbell's current and future female athletes. *See supra* Section II.B.

Further, with respect to retaliation, named Plaintiffs participated in numerous conversations and meetings with DOE employees and officials and experienced first-hand the retaliatory actions of Defendants. T.T. Decl. ¶¶ 41-43; A.B. Decl. ¶ 17. Such retaliation has a chilling effect on other Class members.

These injuries are "reasonably co-extensive" with those that unnamed Class members face or will face absent cessation of Defendants' discriminatory conduct. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011); *Hanlon*, 150 F.3d at 1020. Plaintiffs' claims "arise from the same general fact pattern and rely on the same legal theories" and are typical of the entire Class. *Villon*, 2011 WL 2160483, at *16.

### 4. The Class Representatives Will Adequately Represent the Interests of the Class

The named Plaintiffs will adequately represent the Class. The adequacy requirement of Rule 23 ensures that the named plaintiffs will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry implicates "concerns about the competency of class counsel and

33

conflicts of interest." *Wal-Mart*, 564 U.S. at 349 n.5 (quoting *Falcon*, 457 U.S. at 158 n.13). It also protects against any conflicts between the named plaintiffs and the Class members.  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) ("Adequate representation 'depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive.'" (quoting *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1994)).

Here, both named Plaintiffs are current female athletes at Campbell who share the same interests as the other members of the Class. They have participated in varsity athletics during their four years at Campbell. T.T. Decl. ¶ 5; A.B. Decl. ¶ 6. T.T. was a member of the varsity water polo team for four years and of the varsity swim team for three years. T.T. Decl. ¶¶ 11, 13. Both have histories of playing sports before high school. T.T. Decl. ¶ 6; A.B. Decl. ¶ 7. Named Plaintiffs are enthusiastic about participating in athletics because it helps with their grades and with learning discipline and developing skills for the "real world." T.T. Decl. ¶ 5. Named Plaintiffs also like being on teams and working collaboratively with their teammates. *See e.g.*, A.B. Decl. ¶ 9. T.T. enjoys competition and likes to win and

see what she can learn from her losses. T.T. Decl. ¶ 5. Athletics has helped both grow mentally and emotionally. *Id.*; *see also* A.B. Decl. ¶ 9.

The Class comprises girls with similar interests—student-athletes who dedicate their time to sports at Campbell, or wish to do so, but due to Defendants' discrimination are hindered or altogether precluded from equal treatment, benefits, and opportunities.

Conflicts among Class members do not exist. Female students at Campbell, regardless of the sport they play or wish to play, are together seeking to experience equity through their extracurricular sports participation under Title IX. They all experience fewer and unequal athletic opportunities and inferior treatment and benefits. Plaintiffs have a common goal, to establish Title IX equity at Campbell. T.T. Decl. ¶ 44; K.T. Decl. ¶ 23; S.T. Decl. ¶ 21; A.B. Decl. ¶¶ 5, 29; C.B. Decl. ¶ 4; D.B. Decl. ¶ 47.

As to the adequacy of Plaintiffs' legal team, Plaintiffs secured qualified counsel who will vigorously and competently prosecute this action. *See Wal-Mart*, 564 U.S. at 349 n.5*; Loc. Joint Exec. Bd.*, 244 F.3d at 1162. Plaintiffs are represented by local counsel, the American Civil Liberties Union of Hawaii Foundation ("ACLU of Hawaii"). The ACLU of Hawaii and its attorneys of record have extensive experience litigating civil rights cases such as this one. *See, e.g.*, *Chelius v. Azar*, 1:17-cv-00493-JAO-RT (D. Haw. 2017); *Martin v. City and*

35

*County of Honolulu*, 1:15-cv-00363-HG-KSC (D. Haw. 2015); *see also* Kristen Decl. ¶¶ 52-61 (further detailing qualifications). Plaintiffs are also represented by Legal Aid at Work ("LAAW"). LAAW and its attorneys of record have substantial experience in Title IX matters and in litigating class action lawsuits on behalf of girls, women, minority groups, and persons with disabilities.[8] Kristen Decl. ¶¶ 24-26 (further detailing qualifications). Finally, Plaintiffs' counsel includes attorneys from Simpson Thacher & Bartlett LLP ("STB"), an international law firm. The two lead STB attorneys have extensive experience litigating class action cases, as well as handling Title IX matters. *see also* Kristen Decl. ¶¶ 62-80 (further detailing qualifications).[9]

Plaintiffs and the Class satisfy the adequacy requirement.

### B.    The Class Satisfies Rule 23(b)(2) and Rule 23(b)(1)(B)

Upon finding the Class meets the Rule 23(a) prerequisites, this Court must also find the action satisfies one of three Rule 23(b) conditions. *See* Fed. R. Civ. P. 23(b). Plaintiffs meet both Rule 23(b)(2) and Rule 23(b)(1)(B).

---

[8] LAAW successfully litigated or achieved settlements on behalf of female athletes in *Ollier*, 858 F. Supp. 2d 1093; *Alhambra*, No. CV 04-1460 DT (Mcx), *supra* n. 2; and in other matters. Kristen Decl. ¶¶ 26, 30-35.

[9] Additionally, Plaintiffs' counsel have done extensive work relating to this lawsuit, Kristen Decl. ¶¶ 4-10, 12, 15-16, 23, and will continue committing resources to represent the Class, *id.* ¶ 81.

A class action under Rule 23(b)(2) may be maintained if defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The provision applies "when a single injunction or declaratory judgment would provide relief to each member of a class." *Wal-Mart*, 564 U.S. at 360.

Plaintiffs satisfy the conditions of Rule 23(b)(2). They seek injunctive and declaratory relief, not monetary damages or individualized judgments against Defendants. *See* Compl. ¶ 237; *see also Wal-Mart*, 564 U.S. at 360 (stating that "claims for individualized relief . . . do not satisfy" Rule 23(b)(2)). Plaintiffs seek a uniform judgment that Defendants acted discriminatorily or refused to act on grounds generally applicable to the Class with respect to equal opportunities, treatment, and benefits in athletic programs. As in other Title IX cases, injunctive and declaratory relief are appropriate to correct this form of discrimination. *See, e.g.*, *Biedeger*, 2010 WL 2017773, at *8; *Ollier*, 251 F.R.D. at 565; *Communities for Equity*, 192 F.R.D. at 574-75; *Boucher v. Syracuse Univ.*, No. 95-CV-620, 1996 WL 328441, at *3 (N.D.N.Y. June 12, 1996), *vacated on other grounds*, 164 F.3d 113 (2d Cir. 1999); *Alhambra*, Case No. CV 04-1460 DT (Mcx), *supra* n. 2; *see also Amchem Prods.*, 521 U.S. at 614 (stating "[c]ivil rights cases against

37

parties charged with unlawful, class-based discrimination" are "prime examples" of actions permitted by Rule 23(b)(2)).

Plaintiffs also satisfy Rule 23(b)(1)(B). The injunctive and declaratory relief sought in this action could potentially affect the interests of other Class members. For example, declaratory and injunctive relief concerning Plaintiffs' claims alleging unequal athletic opportunities would be dispositive of claims alleging unequal opportunities by other Class members.

Consequently, the Court should find that Plaintiffs' request for class-wide injunctive and declaratory relief satisfies both Rule 23(b)(2) and 23(b)(1)(B). *See Martin v. City & Cty. of Honolulu*, No. 15-00363 HG-KSC, 2016 WL 4579128, at *2 (D. Haw. Aug. 15, 2016) (certifying class under two Rule 23(b) bases); 7AA Wright & Miller et al., Fed. Prac. & Proc. § 1774 (3d ed.) ("Although suits in which injunctive or declaratory relief is sought most frequently are brought under Rule 23(b)(2), Rule 23(b)(1)(B) also may be applicable since an individual action seeking relief of that type clearly would affect the interests of all class members.").

## V.   CONCLUSION

For the foregoing reasons, as supported by the declarations filed herewith, Plaintiffs respectfully request that the Court grant the motion, certify the Class, and appoint Plaintiffs' counsel as class counsel.

Dated: Honolulu, Hawaii, May 3, 2019.

Respectfully submitted,

/s/ Mateo Caballero
Mateo Caballero
Jongwook "Wookie" Kim
ACLU OF HAWAII FOUNDATION

Elizabeth Kristen
J. Cacilia Kim
Kim Turner
LEGAL AID AT WORK

Jayma M. Meyer
Harrison J. Frahn, IV
Wyatt A. Honse
SIMPSON THACHER & BARTLETT LLP

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the length limit of Local Rule 7.5(b) because, excluding the parts of the document exempted by Local Rule 7.5(d), it contains 8,853 words. In compliance with Local Rules 7.5(e) and 10.2(a), I further certify that this document has been prepared using Microsoft Word 2016 in 14-point Times New Roman font.

DATED: Honolulu, Hawaii, May 3, 2019.

Respectfully submitted,

/s/ Mateo Caballero
Mateo Caballero
ACLU OF HAWAII FOUNDATION

*Attorney for Plaintiffs*